Faithy DOWDELL, Bobby Ann Barnes, Willie L. Nelson (Freeman), Eddie Lee Wynn, Lafayette Dowdell, Johnnie Bridges, Freddie L. Howard et al., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

CITY OF APOPKA, FLORIDA; John H. Land, Mayor of the City of Apopka, Florida; Alonzo Williams, Jr., Richard Mark, Bill Aerosmith, and Jeanette Robinson, Council Members of the City of Apopka, Florida, their Successors and Agents, in their official capacity, Defendants.

No. 78–47–Civ–Oc.

United States District Court, M. D. Florida, Ocala Division.

April 22, 1981.

David M. Lipman, Miami, Fla., Rosalind Gray, New Bern, N. C., for plaintiffs.

Johnie A. McLeod, Apopka, Fla., for City of Apopka, et al.

## OPINION

CHARLES R. SCOTT, Senior District Judge.

This is an action filed by black residents of the City of Apopka, Florida ('City') against the City, its mayor and council members alleging that municipal services have been discriminatorily provided to the black section of town. Seeking declaratory and injunctive relief, plaintiffs claim that defendants have violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the State and Local Assistance Act of 1972 ('Revenue Sharing Act'), 31 U.S.C. § 1242.

Based upon *Johnson v. City of Arcadia, Florida,* 450 F.Supp. 1363 (M.D.Fla.1978), the complaint charges that the City of Apopka, its mayor and four city council members, Alonzo Williams, Jr., Richard Mark, Bill Aerosmith and Jeanette Robinson (collectively referred to as 'defendants') deprived plaintiffs of their right to equal municipal services including:

1. The paving and maintenance of streets;

2. Storm water drainage facilities;

3. The water distribution system;

4. Sewerage facilities; and

5. Park and recreational facilities.

The case was certified as a Fed.R.Civ.P. 23(b)(2) class action on February 8, 1980. The class is defined as

All black citizens of the United States and of the State of Florida residing in the municipality of Apopka who are, or have been, subjected to the discriminatory provision of municipal services.

After extensive pretrial discovery and the termination of a procedural motion battle, the case came on for trial before the Court without a jury. The trial consumed nine days spread over six months. At the close of all the evidence, each side was given the opportunity to file post-trial findings of fact and conclusions of law. Having considered these proposals, having weighed the evidence presented during the trial, and being fully advised in the premises, the Court makes and finds the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### Findings of Fact

A. *Background.*

1. The City of Apopka is located in the central part of the State of Florida, ten miles northwest of Orlando. Its population of approximately 5,000 persons consists of roughly 30% black or other minority citizens. The City is dissected by a major highway to which the tracks of the Seaboard Coastline Railroad run parallel. This dissection forms a triangle in the southwestern section of the City.

2. It is within the southwestern section that the majority of the black residents of Apopka live. Of the 368 black households in Apopka, 312 are located in this section. Of the 56 remaining black households, 38 are located either in integrated apartment complexes or immediately north of the railroad tracks. The rigidity of the residential segregation of the races in Apopka is clear. The specific area which the Court finds to be the "black community" is bounded on the west by Hawthorne Avenue, on the south by Tenth Street, on the east by the Seaboard Coastline Railroad tracks, and on the north by Fourth Street.

3. The City of Apopka provides, maintains and improves certain municipal services and facilities for its residents. The City has undertaken construction and/or maintenance of the following services contested in this action: (1) street paving; (2) storm water drainage; (3) sewerage facilities; (4) potable water distribution; and (5) parks and recreational facilities. Construction and maintenance of these services have been financed by a variety of private, city, county, state, and federal programs. While some street paving has been accomplished through private front-footage assessments, there does not exist a consistent City policy to finance street paving from complete or even partial private resources.

B. *Historical Discrimination.*

4. The City of Apopka is governed by a mayor and city council. The mayor as well as members of the city council are elected at large. Although a black man has served on the city council since 1970, all appointments by the mayor and council for unexpired vacancies on the council have been white. Although blacks serve on the City's Zoning Board of Adjustment, Zoning Commission, Citizens Planning Advisory Committee, Crime Prevention Committee, and a black person represents the City on the board of the Lake Apopka Natural Gas District, the key administrative positions in the City including city clerk, fire chief, police chief, director of streets and sanitation, recreation director, parks director, city attorney, and city prosecutor are all held by whites.

5. Very few blacks are employed by the City of Apopka. Of the approximately 85 persons on the payroll of the City only 4 or 6% are black.

6. The City has virtually ignored complaints and requests by black residents concerning the quantity and quality of the municipal services provided the black community, while at the same time, the City has acted favorably on many similar requests from white residents. Although the complaints by black residents may have decreased to some degree in recent times, the decrease is due in part to the feeling by black residents that their complaints "didn't seem to get anywhere." Since the filing of this suit, the City mailed letters to all black residents inquiring about any complaints concerning sewer and water service. Very few, if any, residents responded. Because of the nature of the allegations of the complaint in this case, the Court does not find this lack of response material.

7. Not only has the City failed and refused to respond to requests by black residents to construct and/or improve municipal services in the black community, but it has directed its financial attention to newly-annexed and predominately white sections of town. Nearly $800,000 has been spent in the past 13 years to extend municipal services to the annexed areas. Although some of the facilities in the annexed areas were constructed and paid for by the developer, their continued maintenance is the responsibility of the City. Moreover, as will be discussed in more detail below, the additional demand for services created by the annexed areas has adversely affected the availability of certain services in the black community.

8. The City of Apopka has received Federal Revenue Sharing Funds from the Office of Revenue Sharing ('ORS') and through the State of Florida's Revenue Sharing Allotment. Of the total amount expended by the City for construction of or improvement to municipal services affecting residential areas, approximately 90% of the funds were allocated to the predominately white areas of the City.

9. At the same time that this lawsuit was filed, plaintiffs also filed an administrative complaint with the ORS involving the same municipal services questioned in this case. On November 29, 1979, the ORS issued a predetermination finding that the City was in violation of the non-discrimination provisions of the Revenue Sharing Act. The ORS found that racial discrimination existed in the following municipal services: (1) street paving; (2) water service; (3) storm water drainage; and (4) sewerage. In a letter dated February 27, 1980, the ORS determined that the City had complied with the non-discrimination provisions of the Revenue Sharing Act with respect to the City's sewerage service and water distribution but remained in violation of the non-discrimination provisions with regard to street paving and storm water drainage.

10. On July 12, 1937 an ordinance was passed by the City of Apopka prohibiting blacks from living on the northern side of the Seaboard Coastline Railroad tracks and prohibiting whites from living on the southern side of the tracks. Although there is little evidence that the ordinance was enforced by the City, there is some evidence that its existence persuaded blacks to dispose of real property owned by them on the northern side of the railroad tracks. The ordinance was repealed in March 1968.

C. *Specific Municipal Services.*

### I. STREET PAVING.

11. There are numerous roadways in the black community that are not paved. Of the 27,950 feet of street in the black community, 11,825 feet or 42% are unpaved. In comparison, only 9% or 11,775 feet of the total 134,520 feet of streets in the white neighborhood is unpaved. Thirty-three percent of the residences in the black community front on unpaved streets, while only 7% of the residences in the white section of the City front on unpaved streets.

12. Defendants challenge these figures on three grounds. First, defendants contend that a number of the roadways included in the street footage tabulations are not owned by the City but are private property and, thus, the City has no authority or duty to pave them. Extensive evidence was introduced by plaintiffs indicating that the unnamed streets represented by facts numbered 6, 16, 25, 26A, 40, 46, 46A, 50, 52, 55 and 59 of plaintiffs' Requests for Admissions are maintained by the City. The evidence consisted of a video tape presentation showing the condition of the roadways, various photographs, and a collection of soil samples taken from and around the roadways. The video tape presentation showed that the roadways had been graded by use of road grading equipment with slight mounds of soil on the extreme sides of the road. The photographs likewise showed that these roadways had been mechanically graded. The soil samples indicated that the soil in and on the roadways is of a clay and sand composition that varies materially from that of the areas adjacent to the roadway path. Although the City, through Mayor Land, denied conducting regular maintenance of these roadways, it did admit to bringing in clay occasionally to help remedy flooding problems. Moreover, in letters to the ORS, Mayor Land represented that "[T]he City may have from time to time put some clay down or did some maintenance on some of the unnamed streets or alleys." Evidence was also presented indicating that the City had maintained the roadways over a continuous four-year period. Accordingly, by operation of Fla.Stat. § 95.361, the streets are deemed dedicated to the City of Apopka and, thus, the City has the authority to pave them.

13. Secondly, defendants claim that the roadways represented by facts numbered 6, 16, 25, 26A, 40, 46, 46A, 50, 52, 55 and 59 of plaintiffs' Requests for Admissions are alleys and, in accordance with the City's general policy, are not properly subject to being paved. Evidence was presented showing that alleys in the white section of town are not paved either. The basic difference, however, between these so-called alleys in the black community and the alleys in the white section of town is that the white alleys separate backyards of residences and are used primarily for garbage pick up and service vehicle access while the black alleys provide access to the front of the homes that abut them. In the black community the so-called alleys are in reality narrow unpaved streets on which a large number of homes front. Defendants contend that regardless of what they are called, these unpaved roadways have too narrow a right-of-way to allow paving in accordance with City specifications which require a right-of-way of 60 feet. It is true that the homes fronting on some of these streets are too close together to allow a 60-foot right-of-way. However, because the so-called alleys are in fact streets and because the City has, in other instances, paved streets with less than a 60-foot right-of-way, the Court finds that the so-called alleys are properly included in the number of unpaved streets in the black community and that the City's general specifications cannot prevent the paving of the streets.

14. Defendants have also challenged plaintiffs' evidence as to the disparity of paved streets in the black and white communities on the basis that certain unpaved streets were improperly excluded from the total of unpaved streets in the white section of town and that certain unpaved streets included in the black community are integrated or commercial and thus improperly included in the tabulation of paved streets in the black community. The Court finds that plaintiffs' tabulations are correct. The streets omitted from the white section of town are not residential streets, there being

no homes abutting them, nor do they serve as access routes. The streets included in the black community tabulation, although approaching the commercial district of town, have enough homes fronting them and other residential characteristics to support their inclusion within the black residential community. Additionally, there is but one white household existing in the area of these streets.

15. Based on the foregoing, the Court finds that there is disparity in the provision of street paving between the black community and the white section of Apopka.

## II. STORM WATER DRAINAGE FACILITIES.

16. Plaintiffs presented evidence showing that the storm water drainage facilities in the black community are either inadequate or totally non-existent. Of the total residential street footage in the black community, none is joined with a curb and gutter system while over 60% of the residential streets in the white section of town have curbs and gutters. Correspondingly, none of the homes in the black community front on streets with curbing and gutters while 48% of the homes in the white section do. Defendants have not challenged the statistical evidence presented by plaintiffs, but do contend that it is misleading because other methods of storm water drainage exist.

17. In addition to the video tape presentation, plaintiffs introduced photographs of the drainage conditions in the black community and the testimony of Mr. John Foster, who as a qualified expert in engineering, personally surveyed the drainage facilities in the black community. This evidence indicates that the principal method of draining storm water from the streets and property in the black community, where a method exists at all, is by way of drainage ditches dug along the side of the streets. While in many cases, the use of drainage ditches is an acceptable, if not preferable, method of containing and transferring storm water run-off, the evidence shows that this method is not functioning properly in the black community. From the photographs and video tape presentation, it appears that one reason for the inadequacy of this method of storm water control in the black community is the lack of regular maintenance of the drainage ditches. Obstruction of traffic by water standing in the streets or overflowing the drainage ditches appears to be common after a heavy rainfall. This does not appear to be the case in the white areas of town. Accordingly, the Court finds that the facilities in the black community for draining storm water are unequal and inferior to those provided to the residents of the white section of town.

## III. WATER DISTRIBUTION SYSTEM.

18. Plaintiffs complain that the water service to residents of the black community is not of the same quality as the service provided to residents of the white section of town. The principal complaint of the plaintiffs who testified is that the water pressure at their homes is so low that ordinary use of the water for such things as bathing is at times impossible. Defendants do not refute these allegations. Instead, they contend that the problem is city-wide. Defendants, however, offered no evidence to support this contention. From the testimony of plaintiffs' expert, Mr. John Foster, it appears that the primary cause of the low water pressure in certain areas of the black community is the use of what are termed "service lines". In the usual system of water distribution, and in the one found in the white section of town, a water main of fairly large proportions is run underneath the street on which the homes front. From this main line, each resident runs, at his own expense, a connection line to the plumbing in the house. At the point of connection, a water meter is installed. Although much of the black community is serviced in this manner, in some areas, those in which the homes do not front on a street recognized as such by the City, a service line system is used. In the latter case, a service line ranging from ½ to ¾ inches in diameter is run from the nearest street under which a main line is located to the homes that abut on the unrecognized street. These service lines cross other private property and provide service for as

many as 16 households. The main line to which the service line is connected may be as small as two inches in diameter. It is due to the size of the main line and the service line and the number of households connected to the service line that the water pressure in parts of the black community is low. Defendants' own expert testified that servicing as many as three to four households from a ¾ inch line is unacceptable. Further, the City's own specifications would limit the service from a service line of less than 1½ inches in diameter to one household.

19. Defendants also argue that implementation of the City's master water plan will benefit the residents of the black community. The Court has no doubt that the plan would increase the total amount of water available to the residents of the black community as well as all residents of the City of Apopka. However, because the problem complained of by plaintiffs is due to the inadequacy of the size of the lines and not due to the amount of the water available, it does not appear that the plan's implementation will alleviate plaintiffs' problems.

20. Accordingly, the Court finds that the use of service lines to distribute water to certain residents of the black community is a system inferior to that used in the white section of town.

## IV. SEWERAGE FACILITIES.

21. Plaintiffs challenge the equality of sewerage service in the black community on grounds similar to those on which they challenge the water distribution system. They contend that because the City has not installed sewer mains beneath the street directly in front of each home and because some of the main lines that are installed do not connect up with the City's sewer network, the sewer service in the black community is not equal to that available in the white section of town.

22. Plaintiffs' evidence on this claim includes the City's master sewer plan and other sewer documents, a detailed survey of every street, household and sewer connection in the city, and the testimony of their expert, John E. Foster. This evidence supports plaintiffs' claim that laterals, lines similar to the service lines in the water distribution system, are used in sections of the black community, and that due to the use of these laterals, some homes are further than 200 feet from the City's sewer line. The evidence also shows that in some sections of the black community, residences are connected to "dead ended" sewer lines, lines which have been installed under the street fronting their property but not connected to the City's sewer line network. The use of laterals and the existence of "dead ended" sewer lines is not as extensive in the white sections of town.

23. Plaintiffs' expert testified that because of these differences, the sewer facilities in the black community were not in parity with those available in the white sections. He concluded that the quality of service in the black community was inferior because less households had sewer facilities available and because of the use of laterals.

24. However, of the several members of the plaintiff class that testified, none had any complaint about the sewer service they were receiving. From the evidence it appears that those residents of the black community who wish to connect to the City's sewer system have been able to do so. No evidence was introduced tending to show that the quality of the sewer service in the black community, from the consumer's standpoint, is inferior to that available in the white sections of town.

25. Although there does exist some difference between the sewer system in the black community and the system in the white section of town, the Court cannot conclude that the differences have resulted in inequality or unavailability of service.

## V. PARKS AND RECREATION.

26. Plaintiffs complain that the parks and recreational facilities available to residents of the black community are inferior to those in the white sections of town. In support of this claim, plaintiffs presented the testimony of Mr. Robert Koger, a video tape tour of the City's recreational com-

plexes, photographs and slide pictures. Defendants responded with the introduction of their photographs, video tape, slides and the testimony of Mayor Land and Recreational Director Betty J. Daniels.

27. The City of Apopka owns or maintains ten recreational parks or complexes. Seven of these are located in the area of the city predominately inhabited by white residents. Two parks are located in the black community. One recreational facility, the city gym, which is located behind City Hall, can be properly placed in neither the white or black sections of town. A summary of the City's park and recreational facilities is listed in the margin.

28. All recreational areas are open to anyone who wishes to use them and all city-sponsored recreational activities are open to the general public. The statistics compiled by the City, however, indicate that a majority of those persons using the recreational facilities north of U. S. Highway 441 are white while a majority of those persons using the facilities in the black community are black.

29. Many of the city-owned recreational facilities are located near the geographic center of the town. Although U. S. Highway 441 creates an obstacle to black residents seeking to visit the recreational areas in the white section of town, it is not so great as to impose upon the City the duty to duplicate the facilities available north of the highway for the blacks residing south of the highway. There exist large blocks of white residents, who, for similar reasons, may not have as easy access to all of the City's recreational facilities as some. There is no evidence that the City has planned or attempted to construct or acquire recreational areas in every neighborhood of the City. On the contrary, it appears from the evidence that the City has attempted to improve and cultivate those recreational areas that have been in existence for decades.

30. From the video tape presentations by both plaintiffs and defendants, it is abundantly clear that all recreational areas of the city are in need of varying degrees of repair and improvement. The restroom and concessions building at Edwards Field suffer from water damage and vandalism. The swing sets at the Tenth and Hawthorne recreational area lack the actual swings themselves. The chain link fences at both the Edwards Field complex and at the Sixth and Hawthorne recreational area are in dire need of repair. No evidence was presented which would support the claim that maintenance of the recreational areas of the black community is passed over for further maintenance and improvement of the facilities in the white areas.

31. The largest and most well-equipped recreational facilities are located in the white area of town. There exist, however, recreational areas in the white section of town which are no more well-equipped than the recreational areas in the black community. Funds from the City's recreational department are spent on recreational programs in both the white areas and the black community. The park at Sixth and Hawthorne is staffed by a part-time employee of the City Recreation Department who can make equipment available to those who wish to use it.

32. Judged on the basis of accessibility, quality and quantity, the recreational facilities available to the black residents of Apopka are not inferior to those available to the white residents. To find otherwise would impose upon the City the duty to duplicate facilities in the black and white sections of town. Although there does exist a difference in the type of facilities found in the black community and the white area of town, that there are parks and facilities in the black community which are maintained and supported by the City of Apopka on a generally equal level with those in the white areas satisfies the Court that the differences are inconsequential.

## Conclusions of Law

### A. Jurisdiction.

1. The Court has jurisdiction over the individually-named defendants, acting in their official capacities. 28 U.S.C. §§ 1331(a) and 1343(3) and (4).

2. The Court has jurisdiction of the defendant City of Apopka. 28 U.S.C. §§ 1331(a) and 1343(3) and (4). *Monell v.*

*New York City Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611, 635 (1978).

3. The Court has jurisdiction over plaintiffs' Section 1983 claim pursuant to 28 U.S.C. § 1343(3) and (4).

4. Jurisdiction of plaintiffs' claim pursuant to 42 U.S.C. § 2000d *et seq.* (Title VI of the Civil Rights Act of 1964) and 31 U.S.C. § 1242 (Revenue Sharing Act) is conferred by 28 U.S.C. § 1343(3) and (4).

### B. *Constitutional Claims.*

5. Having found as a matter of fact that street paving, storm water drainage and water distribution are provided to the residents of the black community in an inferior fashion, it remains to be determined whether the disparity is constitutionally impermissible. Disparity or disproportionate impact alone does not necessarily indicate a constitutional violation, although it may be probative of the intent to discriminate. The inequality in services must result from discriminatory intent or purpose. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–563, 50 L.Ed.2d 450, 464 (1977); *Crawford v. Western Electric Company, Inc.*, 614 F.2d 1300 (5th Cir. 1980). Because intent will rarely be expressed, the court may look to various factors from which the intent or purpose to discriminate may be inferred. In addition to statistical disparity, these factors include: (1) the historical background of the decision or action; (2) the specific sequence of events leading up to the challenged decision or action; (3) procedural or substantive departures from the normal course of action; and (4) the legislative or administrative history of the decision or action. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 267–68, 97 S.Ct. 555, 564–565, 50 L.Ed.2d at 465–66.

6. The degree of disparity between the street paving, storm water drainage facilities, and water distribution provided to the black community and those available to the residents of the white areas of town give rise to the inference of discriminatory intent. *Castaneda v. Partida*, 430 U.S. 482, 495, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498, 511 (1977).

7. Historically, the City of Apopka has directed its financial attention to the development and annexation of predominately white residential areas. By necessity, this action has resulted in less emphasis being placed on the needs and desires of the black community. In addition, blacks have been under-represented in chief political and administrative positions within the city government. These factors support the inference that the disparity in municipal services is due to discriminatory purpose or intent.

8. The defendants' general unresponsiveness to requests from residents of the black community for the construction or improvement of municipal services in their neighborhood, when similar requests from white residents are given more favorable treatment, is also suggestive of defendants' discriminatory purpose or intent.

9. That their actions would result in a discriminatory impact on the residents of the black community was not unknown to defendants. A brief visit to the black community makes obvious the need for street paving and storm water drainage control. To spend funds on new sections of town, specifically ignores the need for those funds in the black community. The actions of defendants in nurturing the development of new, predominately white residential neighborhoods with the obvious effect that the black community would not thereby be improved, is indicative of defendants' intention to discriminate against plaintiffs. *Columbus Board of Education v. Penick*, 443 U.S. 449, 465, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666, 681 (1979).

10. The three essential elements which must be proved to establish a constitutional violation in municipal services suits are: (1) existence of racially identifiable neighborhoods in the municipality; (2) substantial inferiority in the quality or quantity of the municipal services or facilities provided in the black neighborhood; and (3) proof of intent or motive. *Johnson v. City of Arcadia*, 450 F.Supp. 1363, 1379 (M.D.Fla.

1978). Plaintiffs have proven each of these elements with respect to street paving, storm water drainage control, and water distribution. Accordingly, plaintiffs have established a violation by defendants of the Fourteenth Amendment and are entitled to relief.

### C. Statutory Claims.

■ 11. Plaintiffs' statutory claims arise out of the Civil Rights Act of 1964, 42 U.S.C. § 2000d and the Revenue Sharing Act, 31 U.S.C. § 1242. To be entitled to relief under these claims, plaintiffs must show that the City of Apopka is a recipient of federal financial assistance and that defendants have used criteria or methods of administration or have selected sites for facilities that have resulted in discrimination in a program or activity supported with federal funds. *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Johnson v. City of Arcadia*, 450 F.Supp. at 1379.

12. Plaintiffs have shown that the City of Apopka has received federal revenue sharing funds and have shown that these funds have been used to construct or improve municipal services. Plaintiffs have also proved that the use of these funds in the area of municipal services has resulted in certain inferior services and facilities to the residents of the black community.

■ 13. Although there is some authority for the proposition that a violation of the Civil Rights Act or the Revenue Sharing Act may be established upon a showing of mere discriminatory effect, the Court holds that in line with the discussion above, plaintiffs have shown discriminatory intent and purpose. Accordingly, with respect to street paving, storm water drainage control, and water distribution, plaintiffs have established a violation of the Civil Rights Act and the Revenue Sharing Act and are entitled to relief.

### D. Relief.

■ 14. Having found and held that plaintiffs have established that their rights under the Fourteenth Amendment, Civil Rights Act, and the Revenue Sharing Act have been violated by defendants with respect to providing street paving, storm water drainage facilities and water distribution, it remains for the Court to fashion a form of relief to remedy these wrongs. *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).

15. The ultimate relief to which plaintiffs are entitled is, of course, actual and complete equality in the receipt of municipal services from the City of Apopka. The municipal services available to the residents of the black community should be on par with, and entirely equal to, the municipal services and facilities available to residents of the white sections of town. The first step in reaching this goal is the elimination of the effects of past discrimination in the provision of municipal services. The Court, however, is neither in a position, nor of the inclination, to order defendants to institute specific programs or construct specific facilities or projects. The exact manner in which the conditions caused by defendants' constitutional and statutory violations will be remedied is better left to those who are more fully versed in engineering and building construction. This is not to say, however, that the Court is evading its responsibility to plaintiffs. An injunction will be issued against defendants, prohibiting their spending of any funds on the construction or improvement of municipal services in the white community until such time as the street paving, storm water drainage and water distribution systems in the black community are on par with that of the white sections. With respect to specific revenue sharing funds, the Court will order that these funds be placed in escrow to be used only for the construction or improvement of the municipal services and facilities in the black community. Jurisdiction will be retained over this cause to assure that plaintiffs' rights are fully protected and vindicated.

It will be so ordered.

| A. WHITE RESIDENTIAL | | | | B. BLACK RESIDENTIAL | | |
|---|---|---|---|---|---|---|
| Facility | Location & Size | Fixtures | | Facility | Location and Size | Fixtures |
| 1. 1st & Forrest Ballfield | SE corner of 1st & Forrest (4.13 acres) | Ballfield (R. 1349) | | 1. 6th and Hawthorne | NE corner of 6th & Hawthorne | 2 basketball courts playground, merry-go-round and swing set, small office building with restrooms (R. Vol. I–Feb. 66) |
| 2. City Park | 1st and Orange Park and Forrest (5.31 acres) | 2 Tennis courts, band stand, picnic facilities, playground equipment, swing, climber, seesaw, merry-go-round, slide. (R. Vol. I–Feb. 100) | | 2. 10th and Hawthorne | SE corner of 10th & Hawthorne (1.67 acres) | Picnic tables, swings (broken), 2 grills (R. Vol. I–Feb. 124-25) (R. 1353) |
| 3. Dream Lake Ballfield | Park Avenue North at Dream Lake Elem. School (7.06 acres) | Softball field, dugouts, backstop | | | | |
| 4. Edwards Field | NE corner of 1st & Forrest (8.50 acres) | Softball field (R. 1352) | | | | |
| 5. Dream Lake Park | 500' N. of Myrtle at Park on Lake (1.02 acres) | 2 picnic tables | | | | |
| 6. Community Center | NE corner of Park & 2nd (.19 acres) | Large community building (4,400 sq. ft.); 2 sections: stage and auditorium on one side; second side, arts and crafts, restrooms, kitchen for adult programs. (R. Vol. I–Feb. 117). | | | | |
| 7. Apopka High School Complex (under "Buddy System" shared with School Board) | Martin Street at Maine Street | Football field, tennis courts, dugouts, baseball field, track field (R. Vol. I–Feb. 113-16) (R. 1348-49) | | | | |

[Source: Ex. 10, Interrogatory No. 18 (First Set)]

---

## FINAL JUDGMENT

For the reasons set forth in the Court's opinion of this date, it is now

ORDERED, ADJUDGED and DE-CREED:

1. This judgment extends to all issues set forth in the complaint as filed in this matter and to the class of plaintiffs defined as:

All black residents of Apopka, Florida who are similarly situated and affected by defendants' policy, practice, custom and usage of racial discrimination in provision of certain municipal services in the City of Apopka, Florida.

2. This Court has jurisdiction of the subject matter of this action and the parties thereto.

3. Plaintiffs' constitutional and statutory claims arising out of defendants' provision of sewage facilities and park and recreational facilities are dismissed with prejudice and plaintiffs shall take nothing.

4. Defendants are declared to have violated plaintiffs' rights under the Fourteenth Amendment to the Constitution of the United States, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d and the Revenue Sharing Act, 31 U.S.C. § 1242, with respect to providing street paving and maintenance, storm water drainage facilities and water distribution.

5. Defendants are enjoined from providing municipal services in a racially-discriminatory manner and from spending revenue sharing funds in a racially-discriminatory manner in violation of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, and the Revenue Sharing Act.

6. Defendants are enjoined from initiating or constructing any new municipal services or improvements in the white residen-

tial community until such time as the street paving and maintenance, storm water drainage facilities, and water distribution system in the black community are on par with that which is available in the white residential area. However, the Court does approve of the City of Apopka, Florida performing customary and regular maintenance work for its services and facilities, both in the white and black residential neighborhoods.

7. Pursuant to 31 U.S.C. § 1244(b) of the Revenue Sharing Act, the Court hereby escrows and impounds all current federal revenue sharing funds on hand and all funds to be received in the future by the City of Apopka, Florida. These funds may only be utilized to pay for capital improvements to the municipal services provided to the residents of the black community. Prior to releasing any revenue sharing funds for this specific purpose, defendants shall file a notification with the Clerk of this Court with copies to counsel for plaintiffs.

8. Within 45 days of the date of this judgment, defendants shall submit to the Court, with copies to counsel for plaintiffs, a plan for the construction of and improvements to the municipal services described in paragraph 4 above, which plan shall have the specific goal of remedying the disparity between the availability of these services and facilities in the black community and those available to the white residents of Apopka. The plan shall detail the construction to be done including engineering design, the cost of each project, and the estimated time to completion.

9. Jurisdiction of this cause is retained for the entry of such further and other orders as may be necessary or required to facilitate the execution of this final judgment.