698 F.2d 1181
 Faithy DOWDELL, Johnnie Mae Subbs, et al., on behalf of
themselves and all others similarly situated,
Plaintiffs-Appellees, Cross-Appellants,
v.
The CITY OF APOPKA, FLORIDA, John H. Land, Mayor of Apopka,
et al., their successors and agents, in their
individual and official capacity,
Defendants-Appellants, Cross-Appellees.
 No. 81-5690.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 28, 1983.
 
 Johnie A. McLeod, Apopka, Fla., for defendants-appellants, cross-appellees.
 Rosalind Gray, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., David Lipman and Robert E. Weisberg, Miami, Fla., for plaintiffs-appellees, cross-appellants.
 Appeals from the United States District Court for the Middle District of Florida.
 Before VANCE and ANDERSON, Circuit Judges, and JONES, Senior Circuit Judge.
 VANCE, Circuit Judge:
 
 
 1
 The situs of this case is the small city of Apopka, Florida located in the fern and foliage growing region north of Orlando. More specifically, it is the poor, geographically separate, black community of that city. The plaintiffs (appellees and cross-appellants here) are a Fed.R.Civ.P. 23(b)(2) class comprising the black residents of Apopka "who are, or have been, subjected to the discriminatory provision of municipal services." The main issues on appeal are whether the ongoing relative deprivation of the black community in the provision of municipal services can lead to a finding of discriminatory intent sufficient to find a constitutional violation under the equal protection clause of the fourteenth amendment; whether the district court abused its discretion in impounding the federal revenue sharing funds of the City of Apopka; and whether the district court abused its discretion in the award of attorneys' fees. On cross-appeal, it is claimed that the district court's denial of certain expenses as part of the costs of litigation resulted from error as to the applicable law.
 
 
 2
 The case in the trial court was deliberately modeled on Hawkins v. Town of Shaw, 437 F.2d 1286 (5th Cir.1971), aff'd en banc, 461 F.2d 1171 (5th Cir.1972), and Johnson v. City of Arcadia, 450 F.Supp. 1363 (M.D.Fla.1978). Plaintiffs charged the City of Apopka, its mayor, and four council members with discrimination in the provision of seven municipal services: street paving and maintenance, storm water drainage, street lighting, fire protection, water distribution, sewerage facilities, and park and recreation facilities. After a preliminary finding by the Office of Revenue Sharing that the City was discriminatory in the provision of several of these services, an agreement was reached on improvements in street lighting and fire protection, and the district court filed an order settling these claims. The case went to trial on the remaining five issues.
 
 
 3
 The district court found intentional discrimination in the provision of street paving, the water distribution system, and storm drainage facilities in violation of the fourteenth amendment; Title VI of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000d and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. Sec. 1242 (Revenue Sharing Act). Dowdell v. City of Apopka, 511 F.Supp. 1375 (M.D.Fla.1981).[1] The court issued an order enjoining Apopka from initiating or constructing any new municipal services or improvements in the white community until such time as the disparities in the black community facilities were eliminated and impounding all of the city's federal revenue sharing funds with the stipulation that they be used only to pay for capital improvements in the municipal services provided to the residents of the black community. By separate opinion, plaintiffs were awarded reasonable attorneys' fees. Dowdell v. City of Apopka, 521 F.Supp. 297 (M.D.Fla.1981).
 
 THE DIRECT APPEAL
 
 4
 To trigger strict scrutiny analysis under the fourteenth amendment, preliminary findings of both disparate impact and discriminatory intent are required.[2] Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Appellants contend that the facts adduced in evidence do not support a finding of discriminatory intent. Under the recent Supreme Court holding in Pullman-Standard v. Swint, --- U.S. ----, ----, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982), we "may only reverse a district court's finding on discriminatory intent if [we conclude] that the finding is clearly erroneous ...."
 
 
 5
 We can reach no such conclusion. Substantial evidence, including video tapes, photographs, charts, and the testimony of community residents and of qualified experts who made on-site surveys revealed a disparity in the provision of street paving, water distribution, and storm water drainage.[3] Appellants do not question the accuracy of these statistical findings. Rather, they assert an absence of responsibility for them, claiming them, variously, to be beyond municipal jurisdiction or the result of historical and environmental forces. Their arguments are insubstantial and were properly rejected by the trial court.[4]
 
 
 6
 Refutation of Apopka's attempt to deny municipal responsibility for these services one by one does not conclude our inquiry into discriminatory intent. The gravamen of plaintiffs' claim is that Apopka has intentionally maintained a racially and geographically segregated system of municipal services as a result of which the disparities in the provision of street paving, water distribution, and storm drainage facilities have reached constitutional proportions. Discriminatory intent is not synonymous with a racially discriminatory motive, Palmer v. Thompson, 403 U.S. 217, 224, 91 S.Ct. 1940, 1944, 29 L.Ed.2d 438 (1971). Neither does it require proof that racial discrimination is the sole purpose, McGinnis v. Royster, 410 U.S. 263, 276-77, 93 S.Ct. 1055, 1062, 35 L.Ed.2d 282 (1973), behind each failure to equalize these services. It is, rather, the cumulative evidence of action and inaction which objectively manifests discriminatory intent. United States v. Texas Education Agency, 564 F.2d 162, passim (5th Cir.1977). See also United States v. Texas Education Agency, 579 F.2d 910, 919 (5th Cir.1978) (remarks on denial of rehearing).
 
 
 7
 Although the fluid concept of discriminatory intent is sometimes subtle and difficult to apply, there is ample evidence in this case of the correlation between municipal service disparities and racially tainted purposiveness to mandate a finding of discriminatory intent. Nearly every factor which has been held to be highly probative of discriminatory intent is present.
 
 
 8
 First, the magnitude of the disparity, evidencing a systematic pattern of municipal expenditures in all areas of town except the black community, is explicable only on racial grounds. Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1976); see Washington v. Davis, 426 U.S. at 242, 96 S.Ct. at 2048 (1976). Second, the legislative and administrative pattern of decision-making, extending from nearly half a century in the past to Apopka's plans for future development, indicates a deliberate deprivation of services to the black community. A municipal ordinance restricting blacks to living only on the south side of the railroad tracks remained in force in Apopka until 1968.[5] The ordinance contributed to the ghetto-like qualities of the black residential area. Blacks continue to be significantly under-represented in administrative and elective positions, and their requests for improved municipal services continue to be ignored while substantial funds are expended to annex and develop the new predominantly white sections of town. Third, the continued and systematic relative deprivation of the black community was the obviously foreseeable outcome of spending nearly all revenue sharing monies received on the white community in preference to the visibly underserviced black community. While voluntary acts and "awareness of consequences" alone do not necessitate a finding of discriminatory intent, Personnel Administrator v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979), "actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose," Columbus Board of Education v. Penick, 443 U.S. 449, 464, 99 S.Ct. 2941, 2945, 61 L.Ed.2d 666 (1979).
 
 
 9
 Although none of these factors is necessarily independently conclusive, "the totality of the relevant facts," Washington v. Davis, 426 U.S. at 242, 96 S.Ct. at 2048, amply supports the finding that the City of Apopka has engaged in a systematic pattern of cognitive acts and omissions, selecting and reaffirming a particular course of municipal services expenditures that inescapably evidences discriminatory intent. See Columbus Board of Education v. Penick, 443 U.S. at 456, 99 S.Ct. at 2946; Personnel Administrator v. Feeney, 442 U.S. at 279, 99 S.Ct. at 2296. The finding of discriminatory intent by the district court is not clearly erroneous and therefore is affirmed.
 
 
 10
 Appellants also claim that the district court abused its discretion in impounding federal revenue sharing funds received by the City of Apopka. This contention is meritless. Finding that the disparities in municipal services between the black and white communities constitute a condition offensive to the Constitution, the court judiciously exercised its inherent equitable power to fashion a remedy appropriate to the wrongs committed, Milliken v. Bradley, 433 U.S. 267, 281-82, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (Milliken II); Milliken v. Bradley, 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974) (Milliken I); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15-16, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). By escrowing the funds for the purpose of improving municipal services in the black community, the court took the first step towards ensuring that the unconstitutional disparities would be corrected rather than perpetuated.
 
 
 11
 The escrow of funds was also in full conformity with the court's statutory mandate. The district court found that approximately 90% of the funds received by Apopka from the Office of Revenue Sharing and through the State of Florida's Revenue Sharing Allotment had been used for the construction or improvement of municipal services in predominantly white neighborhoods despite equal or greater need for improvement in the black neighborhood. This is a clear violation of the Revenue Sharing Act, 31 U.S.C. Sec. 1242(a)[6] which states that no person shall be denied the benefits of, or subject to discrimination under, any program or activity of any local government which receives revenue sharing funds. Section 1244(b) of Title 31 similarly prescribes escrow of funds as an appropriate remedy for this violation.[7]
 
 
 12
 Appellants also contest the award of attorneys' fees. The determination of reasonable attorneys' fees is left to the sound discretion of the trial judge. Davis v. Fletcher, 598 F.2d 469, 470 (5th Cir.1979); Norwood v. Harrison, 581 F.2d 518, 520 (5th Cir.1978). In this case, the award was made in consideration of detailed findings of fact upon each of the twelve Johnson factors,[8] Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974), as is required by the law of this circuit. Gay v. Board of Trustees of San Jacinto College, 608 F.2d 127, 128 (5th Cir.1979); Morrow v. Dillard, 580 F.2d 1284, 1300-01 (5th Cir.1978); Norwood v. Harrison, 581 F.2d at 520. We may set this award aside only for a clear abuse of discretion. Welch v. University of Texas, 659 F.2d 531, 535 (5th Cir.1981); Norwood v. Harrison, 581 F.2d at 520; Weeks v. Southern Bell Telephone and Telegraph Co., 467 F.2d 95, 97 (5th Cir.1972).
 
 
 13
 Appellants raise three arguments against the propriety of the fees award: all of them are without merit. First, appellants claim that the trial court erroneously awarded fees for work hours expended on claims which were dismissed with prejudice. The theory that fee applications should be dissected into "winning" and "losing" hours with the latter being non-reimbursable contradicts the law of this circuit. In Jones v. Diamond, 636 F.2d 1364, 1382 (5th Cir.1981) (en banc), we held:
 
 
 14
 In fixing the fee, the district court should be mindful that in complex civil rights litigation ... issues are overlapping and intertwined.... [T]he court must consider the relationship of the claims that resulted in judgment with the claims that were rejected and the contribution, if any, made to success by the investigation and prosecution of the entire case.
 
 
 15
 The district court applied the Jones rule, finding that plaintiffs' claims "were intertwined in that they constituted logical, integrated parts of a single action challenging discrimination in the provision of municipal services." 521 F.Supp. at 301. The interrelationship of the seven contested services is patently apparent.[9]
 
 
 16
 Second, appellants argue that the district court did not take into consideration the fact that some of the items listed on the schedules of hours submitted by the two plaintiffs' attorneys are similar or overlapping. This is not supported by the record. The court below gave detailed consideration to the work performed by each attorney and carefully balanced their respective contributions in computing the fees award. All attorneys who contribute their services to a case may be awarded reasonable attorneys' fees. See, e.g., Tasby v. Estes, 651 F.2d 287 (5th Cir.1981) (authorizing the award of two fees even when work is partially duplicative). We find the award of fees to both Mr. Lipman and Ms. Gray to have been reasonable.
 
 
 17
 Third, appellants claim that plaintiffs' attorneys should not have been compensated for hours invested "prior to the lawyer-client relationship." Their argument is disingenuous. The challenged hours concern conferences with the NAACP of Apopka, and on-site review of the black community of Apopka prior to the selection of the named plaintiffs. This case is a Fed.R.Civ.P. 23(b)(2) class action on behalf of the black residents of Apopka. The lawyer-client relationship may, therefore, be deemed to have been struck when negotiations were begun with the black community of Apopka of which the NAACP may appropriately be considered a part.
 
 
 18
 In sum, we find no abuse of discretion and the award of attorneys' fees should stand in its entirety.
 
 THE CROSS APPEAL
 
 19
 Cross-appellants challenge the district court's refusal to tax travel, telephone and postage expenses as costs against the defendants. In contrast to our review of the fee award, we are not limited to a review for abuse of discretion because, as cross-appellants correctly contend, the district court applied the wrong law. See Northcross v. Board of Education of Memphis City Schools, 611 F.2d 624, 642 (6th Cir.1979), cert. denied, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980).
 
 
 20
 The district court decision was based upon Fed.R.Civ.P. 54(d).[10] Cross-appellants correctly claim that the applicable statute is the Attorney's Fees Awards Act of 1976, 42 U.S.C. Sec. 1988.[11] Under the statutory authority of section 1988, courts in this circuit have long awarded expenses as part of the costs in civil rights litigation. See, e.g., Gates v. Collier, 616 F.2d 1268 (5th Cir.1980), modified, 636 F.2d 942 (5th Cir.1981); Miller v. Carson, 563 F.2d 741, 754-756 (5th Cir.1977). Where cost-shifting is expressly authorized by statute, the traditional limitations of Rule 54(d) and 28 U.S.C. Secs. 1920 and 1923(a) do not apply.[12] Wheeler v. Durham City Board of Education, 585 F.2d 618, 623 (4th Cir.1978). Reasonable attorneys' fees, are ordinarily to be awarded to prevailing parties, unless special circumstances make such an award unjust. See S.Rep. No. 1011 at 4, 94th Cong., 2d Sess. (1976), reprinted in [1976] U.S.Code Cong. & Ad.News 5908, 5912 (hereinafter cited as Senate Report) (stating that this standard, enunciated in Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968), should be incorporated into section 1988).
 
 
 21
 The issue of which expenses are properly chargeable to the defendants under section 1988 is not settled by reference to any pre-determined list of items. It is governed by the purposes of the governing statute and the nature and context of the specific litigation. The purpose of the Attorney's Fees Awards Act is to ensure the effective enforcement of the civil rights laws, by making it financially feasible to litigate civil rights violations. Gates v. Collier, 616 F.2d at 1274-75. Because civil rights litigants are often poor, and judicial remedies are often non-monetary, the Act shifts the costs of litigation from civil rights victim to civil rights violator. Senate Report, supra, at 1-5, [1976] U.S.Code Cong. & Ad.News at 5908-5913. The Act's legislative history states two justifications for cost-shifting. First, it "is designed to give victims of civil rights violations effective access to the judicial process." H.Rep. No. 1558 at 1, 94th Cong., 2d Sess. (1976) (hereinafter cited as House Report). Second, it provides an incentive to individuals to act as "private attorneys general," playing a significant role in the enforcement of important congressional policies. Senate Report, supra, at 3, [1976] U.S.Code Cong. & Ad.News at 5910. Because the Act is designed to translate policy into fact, the standard of reasonableness is governed by the economic realities of civil rights litigation. The legislative history recognizes this real cost requirement:
 
 
 22
 It is intended that the amount of fees awarded ... be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases .... [Fees should be] adequate to attract competent counsel [but not] produce windfalls to attorneys.... [C]ounsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, for all time reasonably expended on a matter.
 
 
 23
 Senate Report, supra, at 6, [1976] U.S.Code Cong. & Ad.News at 5913. See also House Report, supra, at 9. ("The application of these standards will insure that reasonable fees are awarded to attract competent counsel in cases involving civil and constitutional rights, while avoiding windfalls to attorneys").
 
 
 24
 Although the standard for the award of other litigation expenses has not received equally articulate expression, it must be governed by the same principle. Reasonable attorneys' fees under the Act must include reasonable expenses because attorneys' fees and expenses are inseparably intertwined as equally vital components of the costs of litigation. The factually complex and protracted nature of civil rights litigation frequently makes it necessary to make sizeable out-of-pocket expenditures which may be as essential to success as the intellectual skills of the attorneys. If these costs are not taxable, and the client, as is often the case, cannot afford to pay for them, they must be borne by counsel, reducing the fees award correspondingly.[13]
 
 
 25
 The Act's underlying policies must be considered "to flesh out the portions of the law with respect to which ... the congressional enactment [does not] offer conclusive guidance." Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975). Both justifications for cost-shifting indicate that all reasonable expenses should be fully recoverable. First, if the real income of civil rights litigators is decreased because they must absorb costs which are generally billable in other types of cases, the market result will be to channel attorneys toward more remunerative types of litigation. Decreasing the supply of attorneys necessarily decreases the access to the courts of victims of civil rights violations. Berger, Court Awarded Attorneys' Fees: What is "Reasonable"? 126 U.Pa.L.Rev. 281, 312 (1977). As one commentator aptly stated:
 
 
 26
 As Congress recognized, fee shifting can be an "important tool" for ensuring the enforcement of constitutional guarantees. However, the tool is only effective when the award granted by the court covers the expenses of litigation and returns to the attorney a profit equivalent to that which he would have earned in his normal practice. To the extent that the statutory fee returns a lesser amount, lawyers will be economically discouraged from taking these cases.
 
 
 27
 Note, Promoting the Vindication of Civil Rights Through the Attorney's Fees Awards Act, 80 Colum.L.Rev. 370, 372 (1980) (footnotes omitted). Similarly, a requirement that publicly funded organizations absorb overhead costs deflects money from the pursuit of further civil rights litigation. Id. at 371. See generally Nussbaum, Attorney's Fees in Public Interest Litigation, 48 N.Y.U.L.Rev. 301 (1973).
 
 
 28
 Second, the private attorney general doctrine dictates that civil rights lawyers should be fully compensated. Civil rights litigation performs a public service: vindicating fundamental constitutional rights, often obtaining judgments which benefit a large class of individuals, and "enabling vigorous enforcement of modern civil rights legislation, while at the same time limiting the growth of the enforcement bureaucracy." Senate Report, supra, at 4, [1976] U.S.Code Cong. & Ad.News at 5911. Although the private attorney general idea is usually discussed in reference to the parties to an action, it applies equally to their counsel. While it is the litigant who has the grievance, it is the litigator who is the "private attorney" furthering the "general" interest. Attorneys' fees and expenses are awarded not only to make it possible for non-affluent litigants to obtain legal representation, but to reward attorneys whose service has benefited the public interest. Freeman v. Ryan, 408 F.2d 1204, 1206 (D.C.Cir.1968).
 
 
 29
 As its legislative history reveals, the statute seeks to encourage citizens and members of the bar to engage in litigation when necessary to vindicate civil rights. This goal can only be achieved if the potential participants are assured in advance that their expenses will be reimbursed.
 
 
 30
 Note, Promoting the Vindication of Civil Rights Through the Attorney's Fees Awards Act, 80 Colum.L.Rev. 370, 377 (1980).
 
 
 31
 We reject any interpretation of "reasonable costs" which would penalize attorneys for undertaking civil rights litigation. "No one expects a policeman, or an office holder, to pay for the privilege of enforcing the law. It should be no different for a private citizen ...." 122 Cong.Rec. 33,313 (1976) (remarks of Sen. Tunney). Certainly it should be no different for the civil rights attorney. Litigation costs are likely to escalate with inflation and the increasing elaboration of civil rights law. They must not be allowed to whittle away at the fees of the civil rights lawyer.
 
 
 32
 In this circuit the recoverability of costs is determined by the necessities of the case; even relatively large or unusual costs may be taxed when they are reasonably incurred; and there is no bar to complete recovery. In Fairley v. Patterson, 493 F.2d 598, 607 (5th Cir.1974), the costs of developing a reapportionment plan were included in the award as a unique item of expense. The court noted:
 
 
 33
 In public interest litigation, especially, where an attorney may donate his legal talents, the expenses of preparing and conducting the litigation require direct out-of-pocket expenditures by a party, which should be completely recoverable.
 
 
 34
 Id. n. 17 (emphasis added).
 
 
 35
 The award in Fairley was granted under the court's equitable power. The statutory authority and scope to award costs under the Attorney's Fees Awards Act, for civil rights claims falling within its purview, is identical to that which existed under the equitable power in Fairley. The Act was the rapid and explicit congressional response to the Supreme Court decision in Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), holding that the determination as to which statutes were important enough to merit fee shifting under the "private attorneys general" theory had to be made by Congress, not the courts. The Act remedied the "anomalous gaps" left by the Alyeska decision "to achieve consistency in our civil rights laws" by extending statutory authorization to award costs under all federal civil rights statutes which did not already contain such provisions. Senate Report, supra, at 1, [1976] U.S.Code Cong. & Ad.News at 5909. For purposes relevant here, the Act did no more and no less than codify the case law of cost-shifting in civil rights litigation. "[T]here is nothing in the legislative history of Sec. 1988 which even remotely suggests that the treatment of out-of-pocket costs should in any way change as a result of the enactment of Sec. 1988," Gates v. Collier, 616 F.2d at 1279 n. 17.
 
 
 36
 Decisions in the courts of this circuit have awarded expenses reimbursements liberally as appropriate to the specific litigation. See, e.g., Miller v. Carson, 628 F.2d 346, 349 (5th Cir.1980) (telephone and postage); Loewen v. Turnipseed, 505 F.Supp. 512, 517-19 (N.D.Miss.1980) (holding that awards should be limited to normally billable expenses but generously awarding, among other things, travel, food, and lodging expenses); Crowe v. Lucas, 479 F.Supp. 1258, 1263 (N.D.Miss.1979) (awarding telephone, mileage, photocopying and hotel expenses; excluding only $4.88 postage); Armstrong v. Reed, 462 F.Supp. 496, 502 (N.D.Miss.1978) (travel and duplicating expenses); Guajardo v. Estelle, 432 F.Supp. 1373, 1388 (S.D.Tex.1977), aff'd in pertinent part, 580 F.2d 748 (5th Cir.1978) (awarding $6,672.20 in costs including travel, telephone and "the like"); Payne v. Travenol Laboratories, 74 F.R.D. 19, 21-23 (N.D.Miss.1976) (awarding $36,467.49 in out-of-pocket expenses under section 1988 and Title VII with specific expression that these expenses are different from recoverable costs under 28 U.S.C. Sec. 1920).
 
 
 37
 We now make explicit the standard which has been followed implicitly in the majority of these decisions. We hold that, with the exception of routine office overhead normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case may be taxed as costs under section 1988. As is true in other applications of section 1988, the standard of reasonableness is to be given a liberal interpretation. See Gates v. Collier, 616 F.2d at 1275 (cataloging the circumstances in which section 1988 has been given the broadest consistent interpretation). Civil rights litigants may not be charged with selecting the nearest and cheapest attorney. Neither may civil rights attorneys be charged with being financial efficiency experts. The standard necessarily involves a case-by-case balancing of relevant factors. The guideline on what is includable must be that which is appropriate in the context of the attorney-client relationship, the substantive and procedural nature of the case, and the climate in which the litigation is conducted. The guideline on what is excludable is that which is specified in the legislative history: section 1988 may not be subverted into a ruse for producing "windfalls" for attorneys. Senate Report, supra, at 5-6, [1976] U.S.Code Cong. & Ad.News at 5912-13; House Report, supra, at 9.
 
 
 38
 We turn now to the items requested to be taxed as costs in this case. Travel, telephone, and postage expenses are not unusual. All of them have been awarded in the decisions of the courts of this circuit. We observe that the amounts requested for these items are substantial. But we note also that the litigators were civil rights specialists; that they moved closer to the forum during the course of the litigation; that the controlling facts of the case required extensive documentation and the use of outside experts; that the litigation was protracted partially because defendants challenged every motion made by plaintiffs; and that the local climate was conceivably hostile. No factual determination was made on the reasonableness of the costs incurred and we express no opinion thereon. We remand to the district court for a factual determination on whether and how much of the requested expense reimbursement is taxable in the light of this decision and the standard set forth above.
 
 
 39
 AFFIRMED IN PART and REVERSED AND REMANDED IN PART.
 
 
 
 [1]
 Although appellants have not argued absence of discriminatory intent specifically with regard to the statutory claims, appellees suggest that we also consider whether discriminatory effect alone is sufficient to find a violation under 31 U.S.C. Sec. 1242. Our holding on the discriminatory intent issue in regard to the constitutional claim, however, renders any consideration of the statutory claims here unnecessary
 
 
 [2]
 The district court treated discriminatory intent as a substantive element of the claim, Dowdell v. City of Apopka, 511 F.Supp. 1375, 1383 (M.D.Fla.1981), and both parties have seemingly briefed it this way on appeal. It makes no difference to the reasoning or decision of this case whether discriminatory intent is regarded as a preliminary requisite to strict scrutiny analysis or a substantive element of the constitutional claim
 
 
 [3]
 The district court found that 42% of the street footage in the black community was unpaved as compared to 9% in the white community and that 33% of the black community residences fronted on such unpaved streets while only 7% of the residences in the white community did so. As regards storm drainage, the court found that while 60% of the residential streets in the white community had curbs and gutters, no streets in the black community had curbs and gutters. Additionally, it found that water service in many homes in the black community was so inadequate that at many times of the day there was insufficient water for such normal purposes as bathing. 511 F.Supp. at 1379-81
 
 
 [4]
 For example, the city asserts that the unpaved streets are really "alleys" or "private driveways." But the district court properly found, after analysis of soil samples showing municipal road grading and intermittent repair, that there was sufficient evidence of municipal maintenance for the streets to be deemed dedicated to the City of Apopka by operation of Fla.Stat. Sec. 95.361. See 511 F.Supp. at 1379
 The city claims that the water distribution problem results from inadequacies in the privately owned water pipes running from the city's main supply lines to indoor plumbing facilities. But the district court properly found that the source of the water scarcity lies in the fact that the city's main lines are inaccessible to many residences because, unlike the situation in the white community, many streets in the black community are not serviced by municipal main lines so that special "service lines" must be run from main lines on remote streets to as many as sixteen black residences. See id. at 1380-81.
 Finally, the city argues that storm water drainage is a problem throughout the municipality. However, the district court properly found that while the white community is substantially serviced by a curb and gutter system, the "alternate" drainage system in the black community consists only of ditches dug along the sides of the street which function improperly because they are not regularly maintained. See id. at 1380.
 
 
 [5]
 The ordinance, adopted on July 12, 1937, similarly prohibited whites from living on the south side of the tracks. Although there was no evidence that the ordinance was ever enforced, the district court found that it had a persuasive power. 511 F.Supp. at 1378
 
 
 [6]
 31 U.S.C. Sec. 1242(a) states in pertinent part:
 No person in the United States shall, on the ground of race, color, national origin, or sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity of a State government or unit of local government, which government or unit receives funds made available under subchapter I of this chapter.
 
 
 [7]
 31 U.S.C. Sec. 1244(b) states:
 The court may grant as relief to the plaintiff any temporary restraining order, preliminary or permanent injunction or other order, including the suspension, termination, or repayment of funds, or placing any further payments under this chapter in escrow pending the outcome of the litigation.
 
 
 [8]
 The twelve Johnson factors are:
 (1) the time and labor required,
 (2) the novelty and difficulty of the questions,
 (3) the skill requisite to perform the legal service properly,
 (4) the preclusion of other employment by the attorney due to acceptance of the case,
 (5) the customary fee,
 (6) whether the fee is fixed or contingent,
 (7) time limitations imposed by the client or the circumstances,
 (8) the amount involved and the results obtained,
 (9) the experience, reputation and ability of the attorneys,
 (10) the "undesirability" of the case,
 (11) the nature and length of the professional relationship with the client, and
 (12) awards in similar cases.
 The district court actually first computed a "lodestar" figure. See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167-68 (3d Cir.1973), based upon the first and fifth Johnson factors and then adjusted this sum based upon full consideration of the other factors. We can find no fault with this procedure. See Wolf v. Frank, 555 F.2d 1213 (5th Cir.1977).
 
 
 [9]
 Appellants have also asserted that respondents are "prevailing parties" for purposes of the fee award only on the three issues upon which they were granted the court injunction: streets, storm water drainage, and water distribution. Because we apply the Jones rule, we need not reach this question. Were we to do so, however, it is clear that respondents would also be considered prevailing parties as to the two issues (street lights and fire protection) on which settlement agreement was reached prior to trial and the one issue (park and recreational facilities) upon which relief was obtained through the Office of Revenue Sharing administrative process. ORS Findings of March 5, 1981. See Maher v. Gagne, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980); Collins v. Thomas, 649 F.2d 1203, 1205 (5th Cir.1981)
 
 
 [10]
 Rule 54(d) states in pertinent part:
 (d) Costs. Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law.
 
 
 [11]
 42 U.S.C. Sec. 1988 states in pertinent part:
 In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of the Public Law 92-318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 [12]
 The purposes of these statutes are extensively reviewed in Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247-259, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). Fed.R.Civ.P. 54(d) and 28 U.S.C. Secs. 1920 and 1923(a) are modern versions of the Act of February 26, 1853, 10 Stat. 161. The explicit purpose of the 1853 Act was to limit the award of costs to specific itemized expenses related to the mechanics of bringing a case before the courts. These statutes are premised on the so-called "American rule" that each party must bear its own costs. Numerous policies have been considered to underlie the American rule. Among them are the following: (1) it is a prophylactic against abuses in the form of excessive litigation or unreasonable fees being generated by a client and his attorney. See Oelrichs v. Spain, 82 U.S. (15 Wall.) 211, 230-31, 21 L.Ed. 43 (1872); (2) it prevents those with just but monetarily small claims from being hesitant to litigate them for fear of being saddled with their opponent's counsel fees, Wilderness Soc'y v. Morton, 495 F.2d 1026, 1031 (D.C.Cir.1974), rev'd sub nom. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); (3) it avoids the substantial burdens for judicial administration which would result from litigation fees, Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967)
 By contrast, section 1988, and the comparable provisions providing for award of costs in other civil rights statutes, such as 42 U.S.C. Secs. 2000a-3(b), 2000e-5(k), and 3612(c) carve out broad policy based exceptions to the American rule. The justifications for cost-shifting are opposite to those for the American rule: (1) they are designed to induce and encourage litigation on the theory that litigants acting as "private attorneys general" may help to enforce important congressional policies; (2) they are primarily employed in contexts where the remedy is non-monetary; and (3) they effectively limit bureaucratic growth by placing enforcement of the civil rights laws in private hands. See generally Senate Report at 1-4, [1976] U.S.Code Cong. & Ad.News at 5908-5911. Interpretation of what constitutes permissibly taxable costs under these two bodies of law must necessarily be informed by the fact that they are grounded in antithetical policies.
 
 
 [13]
 The fourth circuit's reasoning concerning award of expenses under 20 U.S.C. Sec. 1617 in a school desegregation case applies equally well here:
 Litigation expenses such as supplemental secretarial costs, copying, telephone costs and necessary travel, are integrally related to the work of an attorney and the services for which outlays are made may play a significant role in the ultimate success of litigation as complicated and demanding upon the resources of an attorney's office as that seeking school desegregation. Reimbursement of related litigation expenses would, therefore, plainly further the congressional purpose of encouraging meritorious school desegregation litigation and the related policy of ensuring that those who prevail in such significant social litigation should be fully compensated for their efforts. Indeed, to recount the reasons for including litigation expenses in a fee award is perhaps to state the obvious; for other federal courts have routinely provided for recovery of out-of-pocket expenses in conjunction with fee awards.
 Wheeler, 585 F.2d at 623-24 (footnote and citations omitted). See also id. at 621 ("it makes no difference whether plaintiffs base their claim for attorneys' fees on 20 U.S.C. Sec. 1617 or on 42 U.S.C. Sec. 1988. Both statutes, in practically identical language, provide for an award of a reasonable attorney's fee").