Joyce M. BAKER, Catherine Hammonds, Margaret Baker, Cathy Baker, Tommy Lee McKinney, Ernestine Alexander, Amanda Chappell, Naomi Baker, W.J. Dumas, King S. Baker, Vernette Everette, George Jenkins and Nathaniel Nole, Plaintiffs,

v.

The CITY OF KISSIMMEE, FLORIDA, Dr. George Gant, Mayor; Commissioners James Wells, Bruce R. Van Meter, Ken Maher, and Naomi Winbush, their successors and agents in their official capacities, Defendants.

No. 81–51–Civ–Orl.

United States District Court, M.D. Florida, Orlando Division.

Sept. 20, 1986.

David M. Lipman and Robert E. Weisberg, of Lipman & Weisberg, Miami, Fla., for plaintiffs.

Norman J. Smith, of Brinson, Smith, Heller & Smith, P.A., Kissimmee, Fla., for defendant City of Kissimmee.

William E. Lawton, of Dean, Ringers, Morgan & Lawton, P.A., Orlando, Fla., for defendants Gant, et al.

## OPINION AND ORDER

WATSON, Judge, Sitting by Designation.

In this action, filed February 9, 1981, plaintiffs seek injunctive and declaratory relief to restrain defendants from providing certain municipal services in a racially discriminatory manner. Plaintiffs, a class of "all black citizens of the City of Kissimmee who reside in predominately black neighborhoods in the City of Kissimmee", maintain that they have been unlawfully denied their right to municipal services, including the street paving and street resurfacing and maintenance, in violation of their rights secured by 42 U.S.C. § 1983 under the Fourteenth Amendment of the United States Constitution.[1] Plaintiffs patterned this lawsuit after the municipal services equalization cases of *Hawkins v. Town of Shaw*, 437 F.2d 1286 (5th Cir. 1971), *aff'd en banc*, 461 F.2d 1171 (5th Cir.1972); *Dowdell v. City of Apopka*, 698 F.2d 1181 (11th Cir.1983); and *Johnson v. City of Arcadia*, 450 F.Supp. 1363 (M.D. Fla.1978). The complaint alleges that the City of Kissimmee, its mayor and four city commissioners, acting in their official capacity, deprived black citizens of equal municipal services, and sought that qualitative and quantitative disparities between services provided to black and white citizens be eliminated. This case is presently before the court on the issue of liability.

Thirteen black citizens—Joyce M. Baker, Catherine Hammonds, Margaret Baker, Cathy Baker, Tommy Lee McKinney, Ernestine Alexander, Amanda Chappell, Naomi Baker, W.J. Dumas, King S. Baker, Vernette Everette, George Jenkins and Nathaniel Nole—are the named plaintiffs, black residents of the City of Kissimmee, Florida who represent the plaintiff class.

---

1. At the time the action was filed, plaintiffs sought relief with respect to the following services: (a) paving and maintaining streets; (b) provision of sewerage facilities; (c) provision of water; (d) provision of storm water drainage facilities; (e) fire protection; (f) street lighting; and (g) park and recreational facilities. *See* complaint, ¶ 8. Plaintiffs also sought relief under the Thirteenth Amendment; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq;* and the State and Local Fiscal Assistance Act of 1972, as amended in 1976, 31 U.S.C.

§ 1242. Plaintiffs indicated to the court in the pre-trial stipulation that they were limiting their claims to the provision of street paving, street resurfacing and maintenance, and storm drainage facilities, and, for purposes of liability, only to the constitutionally based claims under the Fourteenth Amendment. Plaintiffs have further indicated in their Proposed Findings and Conclusions that they have abandoned their claim of inadequate storm drainage facilities on presently paved streets. (at p. 38 n. 21).

Filed as a class action, this court, Judge Reed, certified the class pursuant to Federal Rule of Civil Procedure 23(b)(1)(A) to include:

> [A]ll black residents of the City of Kissimmee who reside in predominately black neighborhoods in the City of Kissimmee.

Order of March 29, 1982.

Following this court's denial of various pre-trial motions of defendants in an order of September 21, 1981[2] and extensive discovery by the parties, the parties filed with this court an extensive stipulation of facts on March 29, 1984. This stipulation together with the deposition of plaintiffs' expert historian, Dr. Jerrell Shofner, form the basis of the court's findings of fact.

At the pre-trial conference, held March 29, 1984, both parties indicated that they would present this lawsuit for adjudication upon briefs. The parties thereafter filed cross-motions for judgment upon the stipulated facts, and submitted various briefs in support thereof. On December 9, 1985, the court heard oral argument by the parties on their respective motions for judgment. At that time, the parties informed the court that the anticipated decision pending in the United States Court of Appeals for the Eleventh Circuit in *Ammons v. Dade City,* 594 F.Supp. 1274 (M.D.Fla.1984), *appeal docketed,* No. 84–3786 (11th Cir., November 7, 1984), may have some bearing on the issues in the present case. The court thus took this case under advisement pending the Eleventh Circuit decision in *Ammons.* Order of December 10, 1985. *Ammons* has since been decided by the Eleventh Circuit, 783 F.2d 982 (11th Cir.1986), *petition for rehearing and suggestion for rehearing en banc denied,* 788 F.2d 1570 (1986). This case is thus ripe for resolution.

Having considered all of the evidence, the submissions of the parties, and oral argument, the court now, pursuant to Rule 52(a), Federal Rules of Civil Procedure, issues its findings of fact and conclusions of law.

## FACTUAL BACKGROUND
### Kissimmee

The City of Kissimmee was incorporated in 1883 (Shofner, p. 44). Kissimmee's 1980 population was 15,487 of which 2,028 or 13.1% was black (Source: pp. 11–29, Table 16, 1980, Census of Population, General Population Characteristics—Florida, Publication No. PC 80–1–B11). Kissimmee, Florida is approximately 15 miles south of downtown Orlando. The City is dissected by a major U.S. highway, U.S. 192/441, and by a major railroad line, the Seaboard Coast Line Railroad tracks. The black population of Kissimmee resides predominently in three densely populated and rigidly segregated areas which adjoin the Seaboard Coast Line Railroad tracks. *See,* Defendants' Response to Plaintiffs' Request for Admissions of Fact (First Set) (herein "First Req.Adm.").

The City's largest black residential community is primarily located literally "on the other side of the railroad tracks." The black community situated within each of the Seaboard Coast Line Railroad tracks, forms almost a perfect triangle in the northeastern region of the City. It is bounded on the east by Main Street, south by Vine Street (U.S. 192/441), and on the north by open space. (*Id.*) The second area of the City's black residential community straddles the railroad tracks bounded on the east by Rose and Clyde Avenues, on the north by Oak Street, on the west by a

---

2. Defendants in the initial stages of the litigation resisted plaintiffs' claims and raised various across-the-board defenses. Defense motions included: (1) defendants' (City) motion to dismiss, filed March 26, 1981; (2) defendants' (individual) motions to dismiss, strike and for more definite statement, filed March 26–30, 1981; (3) defendants' (individual) motion to dismiss amended complaint, filed May 21, 1981; (4) defendants' (city) motion to dismiss amended complaint, filed May 26, 1981; (5) defendants' (individual) motion for summary judgment, filed July 10, 1981; and (6) defendants' (city) motion to dismiss second amended complaint, filed August 11, 1981. All of these motions were denied by this court's order of September 21, 1981.

canal and Bermuda Avenue and by Florida and Sumner Streets to the south. (*Id.*) The third segregated black residential community and the oldest is located within a square bounded on the south by the railroad and Mitchell Street. The western boundary is Central Avenue; the northern, Oak Street; on the east, Robinson Avenue completes the square. (*Id.*) There are 485 households in the City's black residential community within these three areas. (Stip. Fact 1, Table 2; Fact 2, Table 8–D). This community is composed of almost all of the 2,028 black citizens which represents almost all black citizens residing in Kissimmee. (Source: Census of Population, *supra*).

## Historical Development of Racial Segregation

Following its incorporation in 1883, the City of Kissimmee, Florida, developed, as many other small Southern rural cities. In the early 1900's, the period referred to as the "Progressive Era," smaller cities throughout the South were beginning to provide various municipal services within their jurisdictions (Shofner, pp. 20–21).[3] As in other southern states, progressivism in Florida was "for whites only." For example, as the State expanded its schools system, the gap between white and black schools widened. Prior to 1900, one of the few public services provided by either state or local government in Florida were the public schools. During this period, state law mandated that for every dollar spent on educating a black child, three and one-half dollars would have to be spent on educating the white child. (Shofner, p. 21.)

Progressive reforms were enacted alongside a growing list of Jim Crow laws which, between 1895 and 1915, provided rigid legal backing to the customary segregation of the races in all aspects of Florida society. In the matter of political reforms, advocates of primary elections wanted an increased voice for "the people" in choosing their leaders, but to liberals as well as conservatives of the 1890's, this meant *white* people only. The primary system followed shortly. While it was progressive in that sense, it was also the "white primary" which subsequently became the most effective device for preventing blacks from voting in the only elections which mattered in early twentieth century Florida. (Shofner, pp. 23, 45–46.)

At the state level and in other partisan political races, the "white primary" effectively prevented blacks from voting in partisan elections. The Democratic Party established the white primary in 1900. One year later, the Florida Legislature passed the "white primary" law which effectively barred blacks from the political process. (Shofner, pp. 23, 45–46.)[4] In addition to

---

**3.** Except where otherwise specifically noted, the court's historical findings are based on the expert testimony of Florida historian, Dr. Jerrel Shofner, Professor of History and Chairman of the History Department of the University of Central Florida, and the parties' Stipulation of Fact. *See* Stipulation, pp. 17–21.

Dr. Shofner is a former president of the Florida Historical Society and one of the foremost living authorities on race relations in Florida during the period from reconstruction to the modern era. *See,* Shofner, pp. 5–8. Dr. Shofner is the author of numerous books and over 50 articles in national, regional and state journals, *id.*, pp. 6–7, relating to race relations. Dr. Shofner's testimony relating to the history of race relations in Florida has been accepted in findings relating to racial discrimination in several cases of the Eleventh Circuit. *See, e.g., Ammons v. Dade City,* 783 F.2d 982 (11th Cir.1986) (Discrimination in municipal services); *Dowdell v.*

*City of Apopka,* 698 F.2d 1181, (11th Cir.1983) (same); *McMillan v. Escambia County,* 638 F.2d 1239 (5th Cir.1981), *rehearing granted* 688 F.2d 960 (1982), *appeal after remand,* 748 F.2d 1037 (1984) (at-large voting dilution challenge); and *NAACP by Campbell v. Gadsden County School Bd.,* 691 F.2d 978 (11th Cir.1982) (same).

**4.** Because the Democratic Primary was tantamount to the election, the exclusion of blacks from the primary effectively denied them the vote. *See McMillan v. Escambia County,* 638 F.2d at 1244 n. 10.

In 1947 the Supreme Court declared the Texas white primary unconstitutional. *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944). Relying on *Smith v. Allwright,* the Florida Supreme Court struck down this state's white-only Democratic primary. *Davis v. State ex rel. Cromwell,* 156 Fla. 181, 23 So.2d 85 (1945).

the white primary, denying blacks the right to vote, in February, 1935, the Kissimmee City Commission issued an "Election Proclamation" which included a Poll Tax clause. With this proclamation, an elector had to pay a poll tax as part of eligibility requirements for voting in municipal elections. (Source: Stip.: Legislative/Administrative Background, No. 4, City Minutes, February 8, 1935 and Plaintiffs' Request for Admissions, Second Set, and Defendants' Response, No. 14 (herein "Second Req. Adm.").

This case exists within the setting of a long history of racial segregation and racially discriminatory practices which can be documented by contemporary sources outlined in the Stipulation of Fact and gathered from: (i) City Commission minutes; (ii) official City of Kissimmee documents, and (iii) various newspaper articles from *The Kissimmee Gazette*.[5] These sources trace the City Commission's successful efforts to create two Kissimmees—one white and one black—through legislation and policy.

The City Commission Minutes record the election of a member of the white man's party in March, 1918. (Source: Stipulation, Legislative/Administrative Background No. 1; City Minutes, March 5, 1918). Reflecting the culture and attitudes of the community, the City Commission reinforced a tradition that adhered to the concept of slavery, if not the reality. In October, 1922, the black community, known as "negro quarters," was subject to inspections by the city health officer and Chief of Police. (Source: Stipulation, Legislative/Administrative Background. No. 2, City Minutes, October 3, 1922).

The City Commission legislated tradition and culture into City Policy in February, 1926. By Resolution, the City Commission opposed creation of any subdivision for "colored people" in "any prominent part" of the City of Kissimmee or in the "vicini-

ty" of white residents' homes. (Sources: Stipulation: Legislative/Administrative Background, No. 3; City Minutes, February 17, 1926; *The Kissimmee Gazette*. March 4, 1926). This *de jure* legislation instituting racial apartheid established a framework for the development of race relations in the City.

The City Commission continued to play a role in segregating black people from the mainstream of Kissimmee life. In 1938 and 1939, prospective purchasers of lots within the City of Kissimmee were required to apply for assignment for their lots through the Kissimmee Development Commission which in turn submitted such applications to the City Commission for final approval. (Source: Stipulation: Legislative/Administrative Background No. 6, Letters from the Kissimmee Development Commission to the City Commission, October 18, 1938 to September 22, 1939). Black citizens of Kissimmee responded by appearing before the City Commission to request that lots be assigned to them as well. (Source: Stipulation: Legislative/Administrative Background, No. 7, City Minutes, September 28, 1939; Second Request for Admissions, No. 73). This practice provided a mechanism for the City to enforce its 1926 Resolution requiring residential segregation.

The City Commission steered commercial development away from the "Negro Section" when planning for the Orange Blossom Trail route. White citizens opposed the most practical route because of their desire to "avert the slums" of the black community. (Source: Stipulation: Legislative/Administrative Background, No. 8, *The Kissimmee Gazette*, October 25, 1940).

Throughout the early 1940's, the City Minutes document the existence of two cities, one black and one white. Seventeen years after the 1926 Resolution which restricted the residence of black citizens to certain areas, the City Manager petitioned

---

**5.** A portion of the parties' Stipulation of Fact has been gleaned from various newspaper articles of *The Kissimmee Gazette*. The court agrees with plaintiffs that, even if not stipulated to by defendants, the articles would be admissible for the reasons and purposes indicated by the court in *Ammons v. Dade City*, 594 F.Supp. at 1280 n. 8.

the City Committee to prohibit the building by "colored people" on Bermuda Avenue north of Hill Street. (Source: Stipulation: Legislative/Administrative Background, No. 9, City Minutes, June 1, 1943; Second Req.Adm. No. 93).

In two actions, the City Commission on September 17, 1943 divided the City further into two disparate communities. The Commission (i) adopted a taxi cab licensure policy which ensured separation of the races and (ii) met with local hotel, restaurant, and bar owners to discuss the City's segregation ordinance. (Source: Stip: Legislative/Administrative Background, No. 10 & 11, City Minutes, September 17, 1943; Second Req.Adm. No. 96).

Beginning in 1947, the City played a more active role in developing a segregated black community by specifically setting aside on the "other side of the tracks" land for a negro subdivision. In May, 1947, the Zoning Committee recommended to the City Commission that certain areas of the City be designated "white areas" or districts. (Source: Stipulation: Legislative/Administrative Background, No. 12, *The Kissimmee Gazette*, May 23, 1947).

Earlier in March, 1947, the City took another official step in perpetuating and reinforcing the development of a separate black community—set apart from its white citizens. On March 4, 1947, the Commission expressed its policy that it was "[v]ery much in favor of establishing a negro subdivision in this locality." (Source, Stipulation: Legislative/Administrative Background, No. 14, City Minutes, March 4, 1947; First Requ.Adm. Nos. 118–19).

Later in the same year, the City Commission approved including a provision in a municipal property deed prohibiting the property's occupation by anyone other than a member of the Caucasian race. (Source: Stipulation: Legislative/Administrative

Background, No. 13, *The Kissimmee Gazette*, November 28, 1947).

Racial segregation continued throughout the 1950's. In 1955, the City Commission discussed the "Negro recreation problem." (Source: Stip.: Legislative/Administrative Background, No. 16, City Minutes, May 3, 1955; Second Req.Adm. No. 170). The City Commission responded to requests for capital improvements in the black community with rejection. When the plans for a sewage lift station that would benefit the black community were presented, the City Commission decided that septic tanks would serve as an alternative. (Source: Stip.: Legislative/Administrative Background, No. 17, *The Kissimmee Gazette*, May 1, 1959).

Twelve years after the seminal 1954 decision of *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the City of Kissimmee found it difficult to relinquish the segregationist policies the City Commission had legitimized throughout the City's history. Reflecting the attitudes of the City Commission and of the white community, *The Kissimmee Gazette* in 1966 published an editorial in favor of a continuation of racial segregation. The editorial explained that the separation of races should extend through every layer of Kissimmee life. ("We oppose integration of the races, by habit and by choice, by observation and by experience, by training and by inclination, out of respect to both races.") (Source: Stipulation: Legislative/Administrative Background, No. 3, *The Kissimmee Gazette*, June 23, 1966).[6]

■ In addition to depriving blacks their share of governmental services, this historical pattern of racial discrimination has lead to present socio-economic disadvantages and has kept blacks out of the City's political process.[7] Only one black person

---

**6.** The Eleventh Circuit has recognized that "[t]hough not legislative history, [newspaper] editorials written contemporaneously with the action are probative of the motivation." *McMillen v. Escambia county, Fla.*, 638 F.2d at 1248.

**7.** The Eleventh Circuit has recognized that past discrimination may lead to "present socio-eco-

nomic disadvantages which in turn can reduce participation and influence in political affairs." *United States v. Marengo County Commission*, 731 F.2d 1546, 1567 (11th Cir.1984) (citing *Zimmer v. McKeithen*, 485 F.2d 1297, 1306 (5th Cir.1973) (en banc), *aff'd per curiam, sub nom East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296

has ever been elected to public office. (Source: Stip. Legislative/Administrative Background No. 22). All present key City positions are held by whites, e.g., City Manager, Finance Director, City Engineer, Public Works Superintendent, Police Chief, Fire Chief. (Stip.: Table 19). *See, Ammons v. Dade City*, 594 F.Supp. at 1280 (only one black "was ever elected to the City Commission") and 1283 (all "present key City positions are held by whites.").

Present City employment statistics reveal that the City has a disproportionally low number of black employees who are relegated to lower paying positions. *See, Ammons v. Dade City, supra*, 594 F.Supp. at 1284 (Similar findings that "[p]resent city employment reflects a pattern of racial discrimination"). As reflected by the following chart, only two blacks earn a salary greater than $20,000.00 per year:

Table 1

SALARIES OF CITY OF
KISSIMMEE EMPLOYEES BY RACE

| THOUSANDS | WHITE | | TOTAL BLACK | | TOTAL (100%) |
|---|---|---|---|---|---|
| 33.0+ | 10 | (90.9%) | 0 | ( 0%) | 11 |
| 25.0–32.9 | 32 | (100%) | 0 | ( 0%) | 32 |
| 20.0–24.9 | 43 | (93.5%) | 2 | ( 4.3%) | 46 |
| 16.0–199 | 67 | (81.7%) | 13 | (15.9%) | 82 |
| 13.0–15.9 | 104 | (88.9%) | 5 | ( 4.3%) | 117 |
| 10.0–12.9 | 98 | (81.7%) | 14 | (11.7%) | 120 |
| 6.0– 9.9 | 58 | (84.0%) | 8 | (11.6%) | 69 |
| | 412 | (86.3%) | 42 | ( 8.8%) | 477 |

(Source: Stip., Fact 6, Table 16. EEO–4 data submitted by City of Kissimmee, November 30, 1983.)

Moreover, very few blacks are employed in professional, technical or administrative positions:

In summary, evidence reflecting that Kissimmee, has historically and presently discriminated against its black citizens in

(1976)), *appeal dismissed and cert. denied*, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984).

In Kissimmee there are great social and economic disparities between blacks and whites. The 1980 census figures indicate that while 31.1% of the black population aged 25 years or older had not received eleven years of formal education, only 15.9% of the comparable non-black population had not completed at least eleven years of formal education. Similarly, while the median income for all families in Kissimmee in 1980 was $14,415.00, the black families' median income was $8,151.00. *General Social and Economic Characteristics, Florida*, Table 165, U.S. Department of Commerce, Bu-

reau of the Census (1980). Furthermore, the housing figures from the 1980 Census reveal that while 48.9% of the total population (2498 of a total of 5104) did not own their homes, 61.3% of housing units with black heads of household did not own their homes. *General Housing Characteristics, Census of Housing, Florida*, Tables 2 and 3, U.S., Department of Commerce, Bureau of Census (1980).

This data, obtained from United States Census information, can be judicially noticed by the Court. *See*, F.R.E. 201(b)(2); *U.S. v. United Brothers of Carpenters and Joiners of America, Local 169*, 457 F.2d 210 (7th Cir.1972).

Table 2

EMPLOYEE PROFILE OF CITY OF KISSIMMEE BY
RACE AND BY CLASSIFICATION OF JOB

| JOB CLASSIFICATION | WHITE | | BLACK | | TOTAL (100%) |
|---|---|---|---|---|---|
| Officials, Administrators | 29 | (93.5%) | 0 | | 31 |
| Professionals | 19 | (90.5%) | 1 | ( 4.8%) | 21 |
| Technicians | 57 | (96.6%) | 2 | ( 3.4%) | 59 |
| Protective Services | 38 | (80.9%) | 5 | (10.6%) | 47 |
| Para-Professionals | 16 | (100%) | 0 | | 16 |
| Office/Clerical | 71 | (89.9%) | 6 | ( 7.6%) | 79 |

(Source: Stipulation, Fact 6, Table 19, EEO–4 data submitted
by City of Kissimmee, November 30, 1983).

various facets of City affairs is documented by the following official acts of the municipality: (1) disenfranchisement in 1935 of blacks in municipal elections through the utilization and enforcement of a City poll tax, which operated in conjunction with the State's "white only" Democratic Primary; (ii) a history of *de jure* residential segregation establishing "another side of the tracks" as evidenced by the City's 1926 Ordinance requiring separate black and white residential development; (iii) providing a mechanism to regulate the 1926 Ordinance in 1938 and 1939 by requiring prospective buyers of realty to first apply through the Kissimmee Development Commission and eventually obtain City Commission approval for such purchases; (iv) steering commercial development in 1940 away from the "Negro Section" when planning for the Orange Blossom Trail route; (v) the City Manager's reinforcement of the 1926 Ordinance in 1943 prohibiting the building by "colored people" in the white residential community; (vi) further enforcing segregation in 1943 by legislating separation of the races in taxi cabs, and hotels, restaurants and bars; (vii) regulating racial segregation through the Zoning Committee's recommendations to the City Commission in 1947; (viii) establishing through policy the development of a separate "negro subdivision" in that same year; (ix) providing in 1947 for the inclusion in a municipal property deed a prohibition against black occupants; (x) the low employment of blacks by the City, particularly in higher paying positions; and (xi) the present status of black citizens at the lowest end of the socioeconomic scale resulting in their effective exclusion from the political process.

The above historical findings are significant and relevant to this case because the very nature of this litigation calls into scrutiny generations of municipal decisions, practices and activities relating to the financing, paving and maintenance of streets. Such matters are clearly probative in determining whether intentional discrimination has been demonstrated because the present conditions of which plaintiffs complain are directly rooted in past events, and specifically the past decisions and practices of the City of Kissimmee. *See Dowdell v. City of Apopka*, 698 F.2d at 1186 ("legislative and administrative pattern of decision-making, extending from nearly half a century in the past to Apopka's plans for future development, indicates a deliberate deprivation of services to the black community"); *Ammons v. Dade City*, 783 F.2d at 988 (same).

**PLAINTIFFS' CLAIMS**

The court now turns specifically to plaintiffs' claims of racial discrimination in the provision of street paving and street resur-

facing and maintenance. The parties do not disagree on the underlying facts, but only the appropriate legal treatment of those facts.

### Street Paving

Plaintiffs' central claim in this action is that the City of Kissimmee has allocated street paving facilities in a racially discriminatory manner. The method agreed to by the parties for comparing the amounts of paved and unpaved street footage in "white neighborhoods" with such amounts in "black neighborhoods" is as follows: The data as to lengths of existing paved and unpaved streets refer only to residential streets; all streets abutting commercial or undeveloped property are omitted. In determining the street classification, the parties have used a 75% factor to classify a street as "predominantly black" or "predominantly white". Thus a "black street" is any street having at least 75% black residents, and a "white street" is any street having at least 75% white residents. Any street having less than 75% black or white residents was considered "mixed" and was completely omitted from the charts.

A large portion of the paved streets in Kissimmee have been paved by independent developers using private funds. Developer-paved streets comprise roughly one-half of the paved street footage in white Kissimmee neighborhoods, and roughly one-quarter of the paved footage in black neighborhoods.[8] The parties sharply disagree on the appropriate treatment of these developer-paved streets in the overall comparison of street paving in black and white neighborhoods. Plaintiffs contend, on the one hand, that the amount of paved footage in the respective neighborhoods should include developer-paved streets together with streets paved through governmental funds, the total of which would be compared with unpaved streets. Plaintiffs claim that such treatment is justified because the "lack of developer interest in the black community, constitutionally speaking, can be traced from the City's official practices which resulted in the creation and perpetuation of a divided, segregated city." (Plaintiffs' Proposed Findings at 46–47). Defendants contend, on the other hand, that since the City played no role in the paving of developer-paved streets, streets paved by developers should be treated as "unpaved" and grouped together with actually unpaved streets, the total of which would be compared with streets paved by the City.

Compelling considerations prevent the court from adopting the position of either party. The court would certainly find it reasonable to include in the data base streets paved by developers during years when the City's laws and practices prohibited blacks from living in white residential neighborhoods. No evidence has been submitted, however, to show when and under what circumstances the various decisions and actions by developers to pave streets have occurred. In absence of such evidence, the chain of causation plaintiffs seek to erect between the official racist policies of past generations and developer paving patterns is too attenuated and speculative for the court to find the City constitutionally liable for those patterns. There can be no doubt that considerable residential development has been required to accommodate the tremendous growth Kissimmee has experienced in recent years. No evidence has been introduced to show that there is racial discrimination in newly developed residential housing, much less discrimination stemming from or tied to official City action. Because the black population in Kissimmee is only 13.1%, even if a residential street were integrated in proper proportions, it would still be considered a "white street" under the approach agreed to by the parties.[9]

---

8. The parties agree that of the 213,097 total paved feet (fronting 3,987 households) in white neighborhoods, 103,955 (fronting 2,526 households) have been paved by private developers. In black neighborhoods, 3,987 feet (fronting 103 households) have been developer paved, of a total of 14,918 paved feet (fronting 238 households).

9. Plaintiffs contend that this case parallels the situation in *Ammons v. Dade City, supra,* where-

On the other hand, the defendants' position that the developer-paved streets be treated as "unpaved" in the disparity analysis is clearly unacceptable. First, because the streets are in fact paved, they need not and cannot be paved by the City. It is thus unrealistic and inequitable to consider them "unpaved." Indeed, under the defendants' analysis the percentage of "unpaved white streets" would increase each time developer paving for predominantly white residential housing occurs in a previously undeveloped area. Second, the court cannot overlook the City's historical role over several generations, discussed above, in rigidly segregating black and white communities in residential areas, commercial establishments and schools; in regulating the purchase of real property by race; in steering commercial development away from the "negro section"; and in regulating racial segregation through zoning regulations. The development of the City of Kissimmee has occurred against the backdrop of this past segregation by law and has created a natural environment for the growth of further segregation through private developers. To view developer-paved streets, which have almost exclusively benefited white residential neighborhoods, as tantamount to "unpaved" streets would be, in effect, to reward the city for its racially segregated practices.

The court concludes that the most satisfactory approach to the disparity analysis, on the stipulated record before the court, is to exclude developer-paved streets altogether. Accordingly, for both black and white communities, only governmentally-paved streets and actually unpaved streets are considered and compared.

As the following charts reveal, even with the exclusion of developer-paved streets from the data base, an unmistakable disparity in street paving exists between the black and white communities of Kissimmee [10]:

COMPARISON OF STREET PAVING SERVICES
BY RACE IN THE CITY OF KISSIMMEE
(EXCLUDING DEVELOPER–PAVED STREETS)

TABLE 3

Footage

| Race of Neighborhood | Unpaved (%) | Paved by City (%) | Total (100%) |
|---|---|---|---|
| White | 68,206 (38.4%) | 109,142 (61.6%) | 177,348 |
| Black | 18,790 (62.7%) | 11,201 (37.3%) | 29,991 |

in the Eleventh Circuit affirmed the district court's inclusion of state and county-owned residential streets in the disparity analysis. To the contrary, the facts of *Ammons* point up the deficiencies of plaintiffs' showing in this case. It is apparent from the court's findings in *Ammons* that much if not all of the state and county paving in white residential areas occurred when city ordinances and practices required racial segregation. *See* 594 F.Supp. at 1288. No basis for such a finding has been furnished in this case. Furthermore, the court in *Ammons* found intimate involvement by the city through repeated requests to the state and county over three decades to have those streets maintained and paved. In contrast, no showing has been made herein of any city involvement in or control over the actions of private developers in Kissimmee.

10. The statistical compilation of comparison of surfaces in the black and white communities is patterned and modeled after *Ammons v. Dade City,* 594 F.Supp. at 1285, *aff'd,* 783 F.2d at 985 n. 8; *Dowdell v. City of Apopka,* 511 F.Supp. 1375, 1379 (M.D.Fla.1981), *aff'd in part,* 698 F.2d at 1185 n. 3 (11th Cir.1983).

TABLE 4

Household Numbers

| Race of Neighborhood | Unpaved | (%) | Paved | (%) | Total (100%) |
|---|---|---|---|---|---|
| White | 562 | (27.8%) | 1,461 | (72.2%) | 2,023 |
| Black | 247 | (64.7%) | 135 | (35.3%) | 382 |

(Source: Stip. pp. 4–5, Fact 2, Tables 6–p and 8–p)

---

### Street Maintenance and Resurfacing

The court next turns to Plaintiffs' claim of discrimination in street maintenance and resurfacing. The parties have agreed upon extensive evidence, which the court finds reflects gross disparities between the races in the provision of street resurfacing. *See* Table 5. This city-provided service—street maintenance and resurfacing—is financed entirely from City funds and no portion has ever been assessed to abutting property owners.

Table 5

CITY OF KISSIMMEE STREET

RESURFACING PROGRAMS (FOOTAGE)

| Year | White Residential | | Black Residential | | Total (100%) |
|---|---|---|---|---|---|
| 1957 | 17,807 | ( 100%) | 0 | | 17,807 |
| 1958 | 2,141 | ( 100%) | 0 | | 2,141 |
| 1963 | 15,359 | (95.6%) | 700 | ( 4.4%) | 16,059 |
| 1965 | 1,075 | (68.3%) | 500 | (32.7%) | 1,575 |
| 1966 | 4,250 | ( 100%) | 0 | | 4,250 |
| 1970 | 11,418 | (97.3%) | 320 | ( 2.7%) | 11,738 |
| 1971 | 4,074 | ( 100%) | 0 | | 4,074 |
| 1976 | 5,459 | ( 100%) | 0 | | 5,459 |
| 1981 | 4,381 | (56.8%) | 3,335 | (43.2%) | 7,716 |
| 1984 | 21,190 | ( 100%) | 0 | | 21,190 |
| Totals | 87,154 | (94.7%) | 4,855 | ( 5.3%) | 92,009 |

(Source: Stip., Table 14, p. 14.)

---

### CONSTITUTIONAL QUESTIONS

The court having found on the record evidence that the contested services of street paving and street resurfacing and maintenance have been provided to the identifiable black residential community in a disparate and unequal manner, the court now proceeds with the constitutional inquiry of whether those disparities violate the Equal Protection Clause of the Fourteenth Amendment.

### Hadnott Defense

The defendants argue, citing *Hadnott v. City of Prattville*, 309 F.Supp. 967 (M.D. Ala.1970) as authority, that the City is not constitutionally responsible for any disparity which may exist in street paving between the City's black and white residential neighborhoods since paving is accomplished through a non-discriminatory, racially neutral special assessment program.

■ The court finds that the facts of this case differ significantly and materially from those of *Hadnott*, rendering the *Hadnott* principle inapplicable. First, although the City of Kissimmee generally levied paving assessments, the city government often did not collect the assessment owed. There has existed a pattern of exemptions, reductions and cancellations of paving liens. If one excludes from consideration developer-paved streets (which obviously were not assessed), only 46% of residential paving footage has been paved through an assess-

ment program where the property owner has paid the full obligation. Of the remainder, 30.3% of such obligations have been cancelled or otherwise not paid.

TABLE 6

STREET PAVING FINANCING[11]

(Excluding Developer-Paved Streets)

| | | |
|---|---|---|
| Assessed Footage in which homeowners have paid obligation | 80,773.4 | (46%) |
| Non-assessed and assessed footage for which obligations have been cancelled or otherwise not paid | 94,982.95 | (54%) |
| Non-Assessed | | |
| Residential streets recommended by the City to be paved solely by State funds: | 12,642 | (7.2%) |
| Residential streets developed by the City to be paved solely by Federal funds: | 3,615 | (2.1%) |
| Assessed streets in which obligations were cancelled or otherwise not paid: | | |
| a) 1911 Street Paving Project | 17,137 | |
| b) June 1934 Bond Issue | 2,234.3 | |
| c) March 1941 Resolution | 15,259.91 | |
| d) May 1956 Resolution | 8,444.39 | |
| e) County Paved | 1,146 | |
| f) January 1948 Replat | 1,654.4 | |
| g) City Paved | 284 | |
| h) Sale/Foreclosure/Quit Claim | 4,547.83 | |
| i) State Road | 2,590.5 | |
| | 53,298.33 | (30.3%) |
| Assessed streets (post–1970) for which obligations have not yet been satisfied: | 25,427.62 | (14.5%) |
| Total: | 175,756.35 | (100%) |

(Source: Stipulation of Facts, pp. 7–8, Tables 9–10)

---

Hence, in practice, Kissimmee's assessment policy has been nonuniform and collection of assessment liens has been inconsistent. This lack of uniformity and consistency renders the *Hadnott* assessment defense inapplicable because in a large portion of cases the actual cost of street paving has been borne by the City. Furthermore, the *ad hoc* nature in which the City has forgiven or cancelled assessment liens is inherently subject to abuse and the court notes that the various City actions to cancel such obligations, which overwhelmingly benefited white residential areas, have principally occurred during time periods when racial segregation was legally enforced.

Second, the City of Kissimmee designated certain streets—*all* located in the white residential community—to be paved by the State Road Department paid entirely through state funds without any assessment ever levied. The total footage of streets paved entirely through state funds is 12,142 feet, all of which is located in the

11. As the parties explained in the pre-trial stipulation, the total footage in the above residential financing chart is different from the total of paved residential streets in Tables 3 and 4 because some early residential streets in the above total are now classified as "commercial" and excluded from the present total.

In addition to these statistical summaries, the parties have stipulated to a series of anecdotal evidence reflecting a pattern of cancelling, waiving or otherwise exempting assessment charges throughout the City's history. *See* pp. 8–10, Stipulation of Facts.

white residential community.[12] *See* Stipulation of Facts, p. 13 Fact 4, Table 13. The city seeks to counter the fact of this imbalance by citing its use of Federal Anti-Recession Funds to pave 3,615 feet of streets in the black community in 1977. *See* Stipulation, p. 13; Defendants' brief, pp. 14–15. The city's allocation of these funds, however, is insufficient to demonstrate responsiveness to the needs of the black community, since the funds were derived from federal programs specifically aimed at economically depressed areas. *See Jones v. Lubbock*, 727 F.2d 364, 382 (5th Cir.1984); *Perkins v. City of West Helena, Arkansas*, 675 F.2d 201, 210 n. 12 (8th Cir.), *aff'd*, 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982).

Third, at least through the time of the initiation of this lawsuit, there has existed a pattern of the city failing to act upon black citizens' assessment petitions in a significant amount when compared to their white counterparts. Under city procedures, citizens who desire street paving through the assessment process indicate their interest by petitioning city officials. The petition acts to initiate consideration by the city to eventually pave the citizens' streets.[13] As can be discerned from the following summary, the city has failed to act upon black citizens' petitions, resulting in their streets remaining unpaved, in a significantly disproportionate amount when contrasted to their white counterparts.

TABLE 7

Residential Street Footage

| Race of Neighborhood | Paved as a Result of Petition | | Petitioned but Unpaved | | Total (100%) |
|---|---|---|---|---|---|
| White | 12,590 | (80.6%) | 3,030 | (19.4%) | 15,620 |
| Black | 1,285 | (38.6%) | 2,040 | (61.4%) | 3,325 |

(Source: Stipulation of Facts, Fact 7, p. 21.)

While defendants do not dispute the foregoing figures, they point out that a petition involving Columbia Avenue in the black community, spanning 1,155 feet and fronting 37 black households, is in the process of being acted upon pursuant to an assess-

12. The City of Kissimmee Commission in conjunction with the Chamber of Commerce and County Commission designated the various streets to be targeted for paving by the State Road Department with funds allocated solely from the Secondary Road Program. *See,* (i) ("City Asks for a 4–Lane Street, Plus Action on Patrick and Limit: The City Commission passed two resolutions concerning the paving of Kissimmee residential streets in the white community by the State Road Department: 1) requesting State information regarding surveys and State plans for completion of the projects; 2) requesting right-of-way requirements for residential streets.") (*The Kissimmee Gazette,* March 16, 1956); (ii) ("State Road Department Includes Kissimmee Residential Streets in Secondary Road Program," (*The Kissimmee Gazette,* June 1, 1956); (iii) ("The State Road Department Allocated Funds For Residential Street Projects in the White Community of Kissimmee,") (*The Kissimmee Gazette,* March 17, 1960); (iv) ("Under the sponsorship of the Chamber of Commerce, the City Commission and the County Commission a great number of roads and streets have been paved from secondary road funds in and around Kissimmee by the State Road Department. These have included such streets as Thacker Avenue, Patrick Street, a portion of Mabbette Street, Central Avenue, resurfacing of Church Street, resurfacing of Lakeshore Drive, East Vine Street, North Main Street and others.") (*The Kissimmee Gazette,* 1960); (v) ("Representatives of the chambers of commerce of St. Cloud and Kissimmee yesterday praised the county commissioners for the Road Program the commission established a week ago.") (*The Kissimmee Gazette,* February 14, 1963); (vi) ("The State Road Department will begin work Monday on Mabbette Street which will be widened to 40 feet and resurfaced from Bermuda to Church Street. Work is being financed and paid for by the state.") (*The Kissimmee Gazette,* July 30, 1964).

13. The court observes, however, that only a small percentage of the total city-paved footage on residential streets has been paved through the petition process. *Compare* Table 7 with Table 3.

ment hearing on April 24, 1984. Even if the court were to include this footage together with black neighborhood footage petitioned and actually paved, the percentage of petitioned but unpaved footage in the black community would still exceed that in the white community by 7.2%. More significantly, however, the Columbia Avenue petition was filed prior to the bringing of this lawsuit and the sequence of events leading to the City action taken would suggest a causal relationship between the lawsuit and the city's response to the petition. *See Jones v. City of Lubbock, supra; Ammons v. Dade City,* 594 F.Supp. at 1297–98.

For the foregoing reasons, the court concludes that the *Hadnott*-assessment defense is not applicable to insulate the City of Kissimmee from constitutional liability under the principles enunciated by the Eleventh Circuit in *Ammons,* 783 F.2d at 987.

### Discriminatory Intent

■ It finally remains for the court to determine whether the disparities found to exist in the City's allocation of the contested municipal services are the result of intentional racial discrimination. Otherwise neutral state action does not necessarily violate the Fourteenth Amendment Equal Protection Clause solely because it has a disproportionate impact on a racial minority. Rather, courts must "adhere to the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976); *Dowdell v. City of Apopka,* 698 F.2d at 1185–86 (11th Cir.1983) (There must be a "correlation between municipal service disparities and racially tainted purposiveness to mandate a finding of discriminatory

intent."); *Ammons v. Dade City,* 783 F.2d at 987 (Same).

In assessing what type and how much evidence is required to establish proof of a discriminatory intent, past decisions have articulated four factors. Evidence as to each factor must be considered by the court in fulfillment of its duty to make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).

■ These factors, probative of discriminatory intent include: (1) the nature and magnitude of the disparity itself (discriminatory impact); (2) foreseeability of the consequences of the City's actions; (3) legislative and administrative history of the decision-making process; and (4) knowledge, in that a defendant's actions would be known to have caused the disparity or discriminatory impact which resulted from their conduct. *See Ammons v. Dade City,* 783 F.2d at 987–88; *Dowdell v. City of Apopka,* 698 F.2d at 1186.

■ In consideration of these four factors, several other concepts rooted in civil rights jurisprudence interplay. First, a claimant need not prove that a racial purpose was the sole, dominant, or even the primary purpose for a challenged action, but only that it "has been a motivating factor in the decision." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. at 265–66, 97 S.Ct. at 563. Discriminatory intent is "simply not amenable to calibration. It either is a factor that has influenced a legislative choice or it is not." *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 277, 99 S.Ct. 2282, 2295, 60 L.Ed.2d 870 (1979).[14] Second, proof of subjective personal bias, motive or ill-will are irrelevant

---

**14.** In the context of a municipal services action, the Eleventh Circuit, in *Dowdell v. City of Apopka,* 698 F.2d at 1185, recognized:

Neither does it require proof that racial discrimination is the sole purpose ... behind each failure to equalize these services. It is

rather, the cumulative evidence of action and inaction which objectively manifests discriminatory intent. (citations omitted).
*See also Ammons v. Dade City,* 594 F.Supp. at 1300.

to the inquiry of whether intentional discrimination exists. *Dowdell v. City of Apopka,* 698 F.2d at 1185 (*citing Palmer v. Thompson,* 403 U.S. 217, 224, 91 S.Ct. 1940, 1944, 29 L.Ed.2d 438 (1971)); *Ammons v. Dade City,* 594 F.Supp. at 1300. Third, proof of intentional discrimination can be, indeed as it often is, developed through circumstantial rather than direct evidence. *See, e.g., Washington v. Davis,* 426 U.S. at 241, 96 S.Ct. at 2048 ("This is not to say that the necessary discriminatory racial purpose must be express or appear on the face of the statute ..."); *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 233, 93 S.Ct. 2686, 2710, 37 L.Ed.2d 548 (1973) (Powell, J., concurring in part and dissenting in part) ("The intractable problems [of proving intent] involved in litigating this issue are obvious to any lawyer. The results of litigation—often arrived at subjectively by a court endeavoring to ascertain the subjective intent of school activities ... will be fortuitous, unpredictable and even capricious."); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. at 266, 97 S.Ct. at 564; *Ammons v. Dade City,* 594 F.Supp. at 1300-01.

### 1. Discriminatory Impact

In proving discriminatory intent "the impact of the official action—whether it 'bears more heavily on one race than another,' *Washington v. Davis,* [426 U.S.] at 242 [96 S.Ct. at 2049]—[provides] an important starting point." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. at 266, 97 S.Ct. at 564; *City of Mobile v. Bolden,* 446 U.S. 55, 70, 100 S.Ct. 1490, 1501, 64 L.Ed.2d 47 (1980).

■ While an official act is not necessarily unconstitutional *solely* because it has a racially disproportionate impact, the Supreme Court has nevertheless recognized that discriminatory impact "may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. at 2049.

*See also Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564 ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.").

This court finds that discriminatory impact standing alone does give rise to an inference of discriminatory intent. *See Ammons v. Dade City,* 783 F.2d at 988 ("The magnitude of the disparities in services in this case is, as we similarly found in *Dowdell,* 698 F.2d at 1186 ..., 'explicable only on racial grounds.' "); *Castaneda v. Partida,* 430 U.S. 482, 495, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). This finding is supported by the overwhelming disparities in the two contested services, street paving and street maintenance and resurfacing. Even discounting the disparities attributable to developer paving, the magnitude of the disparity in street paving in Kissimmee is far greater than the disparity found by the courts in Dade City. *See Ammons,* 594 F.Supp. at 1285, *aff'd,* 783 F.2d at 985-86 n. 8.

This conclusion, that the disparity in services alone gives rise to an inference of discriminatory intent is based upon the: (1) size of the disparity and, more importantly, (2) the nature of the practices at issue in this case. *Ammons v. Dade City,* 783 F.2d at 988. Plaintiffs do not challenge a *single* decision of Kissimmee's to pave or resurface a *single* street in the white community rather than black community. *Compare, City of Memphis v. Greene,* 451 U.S. 100, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981) (Closing of a single white street leading to black community did not rise to a constitutional violation.). Rather, plaintiffs challenge *generations* of decisions of the City resulting in the disparities described herein. *See Casteneda v. Partida,* 430 U.S. at 494, n. 13, 97 S.Ct. at 1280, n. 13 ("Disparity ... sufficiently large" over a period of time makes it "unlikely that it [was] due solely to chance or accident."); *Ammons v. Dade City,* 594 F.Supp. at 1301-02 (Same holding), *aff'd,* 783 F.2d at 988.

### 2. Forseeability

The Supreme Court has recognized that discriminatory purpose can be shown by proof that the discriminatory impact is the reasonably foreseeable consequence of the challenged action. Thus, "actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose," and adherence to a challenged action with full knowledge of the predictable effects is one factor, among others, which may be considered in determining purpose. *Columbus Board of Educ. v. Penick*, 443 U.S. 449, 464–65, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979). *See also United States v. Texas Education Agency*, 564 F.2d 162, 168 (5th Cir.1977), *cert. den.*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979).

Here, the systematic allocation of greater resources, most graphically documented with street resurfacing expenditures, but equally applicable to the street paving services, led to the foreseeable outcome of a deprived black residential community. *See Ammons v. Dade City*, 783 F.2d at 988;[15] *Dowdell v. City of Apopka*, 698 F.2d at 1186.

### 3. Legislative and Administrative History

The most logical way to analyze the causes of current racial disparities is to trace the history thereof from "root" to "branch", *cf., Green v. County School Bd.*, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). This analytical approach is no more than recognition of the plain facts that "present events have roots in the past," *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 332, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952), and that past conduct is significant because "it illumi-

nates or explains the present and predicts the shape of things to come." *Id.* at 333, 72 S.Ct. at 695.

In *Keyes v. School Dist. No. 1 of Denver*, 413 U.S. 189, 210–11, 93 S.Ct. 2686, 2698–99, 37 L.Ed.2d 548 (1973), the Supreme Court confirmed the obvious relevance of this analytical principle to segregation cases. Referring to *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 31–32, 91 S.Ct. 1267, 1283–84, 28 L.Ed.2d 554 (1971), the *Keyes* Court said (413 U.S. at 211, 93 S.Ct. at 2699):

> We made it clear, however, that a connection between past segregative acts and present segregation may be present even when not apparent and that close examination is required before concluding that the connection does not exist. *Intention school segregation in the past may have been a factor in creating a natural environment for the growth of further segregation.* (emphasis added).

*See also Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 465 n. 13, 99 S.Ct. 2941, 2950 n. 13, 61 L.Ed.2d 666 (1979).

Furthermore, in evaluating specific events for evidence of intentional discrimination, "[t]he historical background of the decision is one [relevant] evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. at 267, 97 S.Ct. at 564. This factor is based upon familiar tort principles that inferences may be drawn from evidence of "similar transactions and happenings." McCormick, *Evidence* § 164 (1954 ed.). *See, e.g., Rogers v. Lodge*, 458 U.S. 613, 625, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982)[16]; *Ammons v. Dade City*, 783 F.2d

---

**15.** The Eleventh Circuit recognized, 783 F.2d at 988:

> [W]hen it is foreseeable, as the evidence reflects in this case, that the allocation of greater resources to the white residential community at the expense of the black community will lead to the "foreseeable outcome of a deprived black residential community," ... then a discriminatory purpose as found by the

district court is properly shown. [citations omitted].

**16.** What the Court stated in *Rogers v. Lodge*, bears repeating here:

> Evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when en-

at 988 ("[I]n tracing the history and development of Dade City, particularly with respect to race relations, for its connection to present discrimination in the provisions of the contested municipal services, the district court correctly relied upon a large body of constitutional jurisprudence which recognizes that the historical context of a challenged activity may constitute relevant evidence of intentional discrimination."); *Dowdell v. City of Apopka*, 698 F.2d at 1186; *Brown v. Bd. of School Commrs. of Mobile County, Ala.*, 706 F.2d 1103 (11th Cir.1983); *Terrell v. United States Pipe and Foundry Co.*, 696 F.2d 1132, 1134 (5th Cir.1983); *United States v. Marengo County Com'n*, 731 F.2d 1546, 1567 (11th Cir.1984).

The lengthy documented legislative and administration history of racial discrimination in general and in the allocation and distribution of the contested municipal in particular is clear and persuasive in this case. The past discriminatory actions of the City "illuminate and explain" present existing discrimination in the challenged services. *See United States v. Oregon State Med. Soc.*, 343 U.S. at 332, 72 S.Ct. at 695.

In assessing whether disparities in provision of municipal services can be ultimately traced to a racially discriminatory purpose, the *Ammons* trial court made a detailed analysis of historical discrimination in all areas of life in Dade City, 594 F.Supp. at 1279–1284; observed that Plaintiffs were challenging "successive decisions of the City over the years which resulted in the disparities," *id.* at 1302; and concluded that the "defendants and their predecessors have engaged in a course of conduct which inescapably evidences discriminatory intent and which is the cause and reason for the present disparit[ies]." *Id.* at 1303. The Eleventh Circuit has affirmed the relevance of this evidence, 783 F.2d at 988, in reaching the same conclusion of the existence of intentional discrimination.

As in *Dade City*, there exists a history of discrimination against black citizens in Kissimmee which forms the basis for the development of the City and a segregated black residential community. This court, as did the court in *Ammons v. Dade City*, finds that these historical facts are probative of a racially discriminatory purpose in analyzing present disparities between the black and white residential communities in the distribution of the challenged municipal services.

### 4. Knowledge

The factor of "knowledge", while perhaps difficult to disentangle from "foreseeability" and/or "legislative/administrative history" is additionally present and supports the court's findings of intentional discrimination.

The late Judge Scott's findings in *Dowdell v. City of Apopka*, 511 F.Supp. 1375, 1383 (M.D.Fla.1981), apply equally here:

> That their actions would result in a discriminatory impact on the residents of the black community was not unknown to defendants. A brief visit to the black community makes obvious the need for street paving and storm water drainage control.

█ Although none of these four factors are necessarily independently conclusive, the totality of the relevant facts supports a court's findings that Defendants and their predecessors have engaged in a course of conduct which inescapably evidences discriminatory intent and which is the cause and reason for the present disparity in: (1) street paving and (2) street resurfacing. *See Ammons v. Dade City*, 783 F.2d at 988; *Dowdell v. City of Apopka*, 698 F.2d at 1186.

### RELIEF

█ Once constitutional violations are found to exist, appropriate relief should be fashioned for Plaintiffs. In formulating a remedy to cure constitutional violations, this court is governed by the general rule

joined by courts or made illegal by civil rights legislation, and that they were replaced by

laws and practices which, though neutral on their face, serve to maintain the status quo.

that an equity court must shape its decree so as to secure "complete justice", *Albemarle Paper v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (employment discrimination), in that "the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965) (voting rights). *See also Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Milliken II*) (school desegregation); *Keyes v. School Dist. No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (same); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971) (same); *Green v. County School Bd.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) (same). These principles are as applicable to this case as they are to school desegregation, employment discrimination and voting rights cases.

Within the context of those general equitable principles, the Eleventh Circuit has affirmed a remedy plan in actions such as this, which provides for: enjoining a municipality from "initiating or constructing any new municipal services or improvements in the white community until such time as the disparities in the black community facilities [sic] were eliminated ...", *Dowdell v. City of Apopka*, 698 F.2d at 1184, *affirming in part*, 511 F.Supp. at 1384. *See also Ammons v. Dade City*, 594 F.Supp. at 1304–06 (Same); *Johnson v. City of Arcadia*, 450 F.Supp. at 1380, 1385–86 (same).

In application of these principles, the court will ensure "actual and complete equality in the receipt of municipal services," *Dowdell v. City of Apopka*, 511 F.Supp. at 1384, from the City of Kissimmee. As ordered in the *Apopka* litigation and affirmed by the Eleventh Circuit, the relief should insure that:

> [t]he municipal services available to the residents of the black community should be on par with, and entirely equal to, the municipal services and facilities available to residents of the white sections of town. The first step in reaching this goal is the elimination of the effects of past discrimination in the provision of municipal services.

511 F.Supp. at 1384.

Based upon *Johnson v. City of Arcadia*, 450 F.Supp. 1380–1391, which was followed and approved by the Eleventh Circuit in *Dowdell v. City of Apopka*, 511 F.Supp. at 1384, *aff'd in part*, 698 F.2d at 1138, and *Ammons v. Dade City*, 594 F.Supp. at 1305–06, this court concludes that the specific manner in which street improvements are to be planned, constructed and financed, be left with the parties' various engineers and contractors. However, to eliminate further remedial Stage II hearings, this Court shall instruct Defendants to prepare a plan for equalization of municipal services.

Accordingly, the court instructs Defendants to prepare a plan of equalization which will address the following services:

### 1. *Street Paving*

Defendants shall provide sufficient street paving, construction of which shall adhere to accepted municipal standards, that will eliminate the disparity as found by this court. To achieve parity in the black community, the plan shall provide for the paving of streets so that the percentage of black occupied households fronting unpaved streets is reduced to the percentage in the white community (excluding black and white residential streets paved by private developers).

### 2. *Street Resurfacing*

Defendants shall implement a thorough and comprehensive street resurfacing program in the black community based upon sound engineering standards which shall address the disparities found.

Finally, the court finds that plaintiffs are the prevailing party, and accordingly, pursuant to the Civil Rights Attorney Fees Awards Act of 1976, 42 U.S.C. § 1988, are entitled to an award of attorney fees and

costs. Plaintiffs shall file with the court within twenty (20) days from the issuance of the court's Final Judgment appropriate fee/expense submissions and accompanying memoranda as to this issue. Defendants shall then respond within twenty (20) days from Plaintiffs' filing. Plaintiffs may then file a reply brief within 10 days thereafter.

## FINAL JUDGMENT

For the reasons set forth in the Court's opinion of this date it is now

ORDERED, ADJUDGED AND DECREED:

1. This judgment extends to all issues set forth in the complaint as filed in this matter and to the class of Plaintiffs defined as:

All black residents of the City of Kissimmee who reside in predominantly black neighborhoods in the City of Kissimmee.

2. This Court has jurisdiction of the subject matter of this action and the parties thereto.

3. Defendants are declared to have violated Plaintiffs' rights under the Fourteenth Amendment to the Constitution of the United States with respect to providing street paving and street resurfacing and maintenance services.

4. Defendants are enjoined from providing these municipal services in a racially discriminatory manner in violation of the Fourteenth Amendment of the Constitution of the United States.

5. Defendants are enjoined from initiating or constructing any new municipal services or improvements in the white residential community until such time as the street paving and street resurfacing and maintenance in the black community are on par with that which is available in the white residential area. However, the Court does approve of the City of Kissimmee, Florida performing customary and regular maintenance work, other than street resurfacing in the white residential community, for its services and facilities, both in the white and black residential neighborhoods.

6. Within forty-five (45) days of this judgment, Defendants shall submit to the Court with copies to counsel for Plaintiffs, a plan for the construction of and improvements to the municipal services described in paragraph 3 above, which plan shall have the specific goal of remedying the disparity between the availability of these services and facilities in the black community and those available to the white residents of Kissimmee. The plan shall detail the construction to be done including engineering design, the cost of each project, and the estimated time to completion. The plan shall specifically incorporate and address those directives of the Court outlined in the Court's Findings of Fact and Conclusions of Law.

Plaintiffs shall then submit, if they deem appropriate, within thirty (30) days, any reply to Defendants' plan.

7. Jurisdiction of this cause is retained for the entry of such further and other orders as may be necessary or required to facilitate the execution of this Final Judgment.